No. 20863.

ROBERT M. TSCHUDY, ET AL. *v.*
AMOS C. SUDLER & CO., ET AL.
(407 P.2d 877)

Decided November 1, 1965.    Rehearing denied December 6, 1965.

LEE, BRYANS, KELLY and STANSFIELD, DONALD D. CA-WELTI, for plaintiffs in error.

BRENMAN and EPSTEIN, for defendant in error.

*In Department.*

Opinion by MR. JUSTICE SCHAUER.

THE parties appear here in the same order as they appeared in the trial court. References to the "plaintiff" should be understood to mean Robert M. Tschudy, who at all times pertinent hereto was acting for himself and on behalf of his brother James Tschudy, and his own wife Carla, all of whom are named as plaintiffs. The defendant and third-party plaintiff Amos C. Sudler & Co. will be referred to as defendant or as Sudler, and third-party defendant Forrest Wilcox will be referred to by name.

The case was tried to the court without a jury on April 3, 1963. At the conclusion of the plaintiff's case the defendant orally moved for a dismissal of the plain-

tiff's complaint. The motion was granted. A motion for new trial was filed and denied, and on April 25, 1963, judgment was entered in favor of defendant and against plaintiff for dismissal and costs, and judgment was entered in favor of Wilcox and against Sudler for dismissal and costs. Plaintiff prosecutes this writ of error.

The case involves a series of transactions between plaintiff and Sudler, a stockbroker represented by Wilcox as its "customer's man" or salesman, in respect to the purchase and sale of corporate stock of "Record Vending Machines Corporation." In his complaint the plaintiff alleged a breach of duty on the part of the defendant arising out of the alleged failure of defendant to execute a so-called "stop-loss order" with regard to 400 shares of this stock owned by plaintiff and his associates.

The defendant denied all material allegations of the complaint and set out no affirmative defenses or counterclaim.

There was no written contract between the parties. Plaintiff admits in his brief that it is basically his position that his alleged rights against defendant arise from a fiduciary relationship, or a voluntary agency relationship existing between the parties. In order to recover it was incumbent upon him to establish such a relationship.

The salient facts shown by the evidence are as follows:

Plaintiff and Wilcox had become acquainted prior to their discussions in regard to the stock market. Through this acquaintance plaintiff learned that Wilcox was in the business of buying and selling stocks for Sudler. Early in 1960 the plaintiff and Wilcox had many conversations, usually by telephone, relative to various stock issues, and Wilcox suggested that if plaintiff was interested in the stock market, he, Wilcox, could recommend the purchase of stock in Record Vending, which was considered to have a good growth. On this recommen-

dation plaintiff purchased 100 shares of the stock during March 1960 and, in July 1960, purchased 950 additional shares in two separate transactions, making a total of 1050 shares, a part of which were purchased for his own account, a part for the joint account of himself and his wife, and a part for the account of his brother James. The brother resided in Wisconsin and had been encouraged to make the investment by plaintiff.

Wilcox kept him posted throughout the transaction as to the market quotations on the stock and the progress of the company, "watching it over a period of weeks." Plaintiff also discussed the stock with one Stan Richards, a vice-president of Sudler, and understood that Record Vending stock was what is known as an over-the-counter stock, not listed on the New York Stock Exchange, and that he was buying it from Sudler, which company had underwritten the issue and held the stock in inventory.

At the time of the July purchase, Wilcox and Richards still thought "that the stock had quite a good potential." A day or two after this purchase plaintiff suggested to Wilcox that the latter place a "stop-loss order" for the sale of the stock at $10.25, which was still quoted at $11.25. His understanding of such an order was that when the stock went down to $10.25, or that area, it would be sold at that price or as near that price as could be obtained. Plaintiff was later advised, however, that there was no such thing as a stop-loss order in the over-the-counter market. Thereafter a sale order arrangement was agreed upon.

Subsequently, without consultation with Wilcox, the plaintiff sold 200 shares of this stock on August 17, 1960, and 450 shares on September 13, 1960, all at 10⅝, leaving 400 shares to which he intended the new arrangement with Sudler to apply.

Thereafter the newspaper stock quotations indicated the stock was dropping rapidly and in the latter part of September or early in October 1960, when it had

dropped below 10¼, the plaintiff contacted Wilcox and inquired why the stock had not been sold and was advised that Wilcox had placed the sale order but that it had never been executed. The plaintiff later asked that Sudler buy the stock at 10¼, but the request was refused. Wilcox suggested that the plaintiff retain the stock as all indications were that the price would again rise.

The plaintiff made no effort thereafter to sell the stock, nor did he make any attempt to mitigate any damage he might sustain. At the time of trial he still owned the stock which, to the best of his knowledge, had never again risen to 10¼. There is no evidence in the record as to what, if any, loss would have been sustained by plaintiff had the stock been sold at or before the date of trial.

It was after plaintiff learned that the stop-loss order would not apply to this stock that he sold a part of his stock in August and September 1960, of his own volition, at 10⅝. The stock did not drop below 10¼ until September 27, when it dropped from 10⅝ to 10, but only temporarily.

Plaintiff testified that the only understanding he had with Wilcox was that the latter was acting as a customer's man for Sudler. His counsel expressed his position as follows:

"They are a dealer who got themselves in a position of having a fiduciary relationship of dealing in good faith with their customers * * *."

to which the court replied:

"Your evidence hasn't supported it, unless you have got some evidence to show that they had a duty to him, and on the basis of this evidence I wouldn't have any trouble dismissing this case for lack of any legal obligation on the part of the defendants."

Plaintiff's counsel then stated that the additional showing suggested might be made by Wilcox, as plaintiff himself had testified that he had no evidence available

to establish the existence of any agency or fiduciary relationship between the parties. Wilcox was then called as a witness and corroborated the testimony of plaintiff as to the series of events above recited. However, the only testimoney he gave relative to the basic issue was a statement to the effect that in all their dealings plaintiff had followed the advice and counseling of Wilcox.

The arrangement between plaintiff and Wilcox relative to a sell-out order was fully discussed and agreed upon. Moreover, after discussion between the parties, the evidence in the record reveals that plaintiff made an independent decision to hold the stock at a time when it could have been sold to avoid suffering a loss. Other transactions of a similar nature had been handled by Sudler in the same manner.

No witnesses other than plaintiff and Wilcox were presented. At the close of plaintiff's case, defendant moved for a dismissal of the action which was sustained by the trial court.

The trial court found in effect that the plaintiff failed to meet the burden of proof to support the allegation of the complaint. More specifically, the trial court found that if in fact a fiduciary relationship had been created which was binding upon Sudler, there was also a corresponding relationship, with subsequent negotiations between the parties, which negated the duty Wilcox may have had to the plaintiff. The plaintiff's evidence, which was intended to establish the fiduciary relationship, was a question of fact for determination by the trial court as the trier of facts.

■ The trial court's findings are consistent with and rest on solid support in the record and therefore should not be disturbed.

■■ That part of the trial court's judgment suggesting a ruling on the basis of novation is not approved for the reason that no affirmative defense in this regard was asserted, as required by the rules. The insertion

of an incorrect reason, however, is no ground for reversal of an otherwise correct judgment. *Denver Transport v. Galligan,* 145 Colo. 71, 358 P.2d 28.

The judgment of the trial court is affirmed.

MR. JUSTICE MOORE and MR. JUSTICE SUTTON concur.