PAINE, WEBBER, JACKSON & CURTIS, INC., a corporation, and Sueann A. Ocrant, Personal Representative of the Estate of Lawrence Ocrant, Petitioners,

v.

Caryl ADAMS, Individually and as Trustee of the V.M. Johnson 1962 Trust, Respondent.

No. 84SC58.

Supreme Court of Colorado, En Banc.

May 12, 1986.

Fairfield & Woods, Charles E. Matheson, Denver, for petitioners.

Roath & Brega, Charles F. Brega, J. Stephen McGuire, Stuart N. Bennett, Margaret C. Gilliam, Denver, for respondent.

LOHR, Justice.

We granted certiorari to review the judgment of the Colorado Court of Appeals in *Adams v. Paine, Webber, Jackson & Curtis, Inc.*, 686 P.2d 797 (Colo.App.1983). In that case, the plaintiff, Caryl Adams, claimed that the defendants, Paine, Webber, Jackson & Curtis, Inc. (Paine Webber) and one of its account representatives, Lawrence Ocrant[1], breached the fiduciary duties they allegedly owed her with respect to an individual account and a trust account established in her name at Paine Webber. The jury awarded Caryl Adams substantial damages against both defendants, and the court of appeals affirmed the judgment entered on that verdict. We agreed to review the issues of whether the trial court had jurisdiction to award exemplary damages in this action and whether the trial court erred in instructing the jury that, as a matter of law, the defendants owed fiduciary duties to Caryl Adams during specified periods of time. We conclude that the defendants waived their right to contest the award of exemplary damages and that the evidence supported the trial court's instruction as to the defendants' fiduciary

duties. Therefore, we affirm the judgment of the court of appeals.

I.

Prior to her marriage to her first husband, Ronald Adams, in 1961, Caryl Adams had received approximately 150,000 shares of stock in Illinois Tool Works, Inc. (ITW) from her family. At the time of that marriage, Caryl Adams' assets, primarily consisting of the ITW stock, were valued at approximately $1.8 million. In 1962, Caryl Adams' mother, Violet Johnson, established a trust for Caryl Adams' children (the "Johnson trust"), the assets of which consisted of 1,000 shares of ITW stock. Caryl Adams and Ronald Adams were named as co-trustees.

Using the dividends from Caryl Adams' ITW stock, Ronald Adams invested in a variety of businesses in the late 1960s and the early 1970s. He also opened accounts at several brokerage firms in Denver and used Caryl Adams' stock as collateral for borrowing in those accounts to obtain funds for his businesses. By 1973, Ronald Adams owed large sums of money to several brokerage firms and to a bank. All the loans were secured by Caryl Adams' stock.

In April 1973, Ronald Adams met Lawrence Ocrant, who was a stockbroker. Ocrant suggested that Ronald Adams consolidate all of his debts. After Ocrant began working at Paine Webber in mid-1973, a Paine Webber account was opened in the name of Caryl Adams (the "personal account") at the instance of Ronald Adams and Ocrant, and those two men arranged to transfer the accounts that existed at the other brokerage firms to Paine Webber. To accomplish this, Paine Webber paid the other firms the amounts owing on the accounts and in return received the securities in the accounts, including the ITW stock certificates, which had been used as collateral for the borrowings in those accounts. The same arrangement was made with a bank that had loaned money to Ronald

---

**1.** Lawrence Ocrant died in May 1984, and Sueann Ocrant, as personal representative for the estate of Lawrence Ocrant, was substituted as petitioner upon motion of the respondent.

Adams. The personal account at Paine Webber was placed "on margin," which meant that the account owner could borrow funds from Paine Webber for the purchase of new securities and that the securities in the account would serve as collateral for such loans.

To open the personal account and to effectuate the various transfers, Ronald Adams obtained Caryl Adams' signature on several documents and wrote what purported to be her signature on others. Caryl Adams testified at trial that she signed these documents at Ronald Adams' request without reading them. She also testified that she left all business and financial matters to her husband and did not even know that the Paine Webber personal account existed until December 1974, shortly before Ronald Adams first introduced her to Ocrant. Prior to that time, Paine Webber sent all correspondence about the account to her husband's business address and Ocrant neither called nor wrote Caryl Adams concerning the account. From the time the account was opened through November 1974, Paine Webber disbursed over $2,110,000 from the account and sold over 50,000 shares of Caryl Adams' ITW stock.

In September 1973, Ronald Adams opened a second Paine Webber account as a trustee, with Caryl Adams, of the Johnson trust (the "trust account"). Caryl Adams' testimony suggests that until December 1974, she was not aware of the existence of the trust account. Ocrant purchased and sold corporate bonds on behalf of both accounts, sometimes selling ITW stock to finance purchases in the personal account. For each purchase or sale of a $1,000 bond, Paine Webber received approximately five dollars as a commission.

In November 1974, Caryl Adams went to see a lawyer, Robert Appel, because she could not understand her husband's newly developed irritability and was concerned that something was amiss. She suggested that Appel check the status of her stock. After learning about this visit to Appel, Ronald Adams told Caryl Adams about the Paine Webber personal account and about his use of her ITW stock. He then introduced Caryl Adams to Ocrant and told Ocrant to begin sending all correspondence about the account to Caryl Adams. Shortly thereafter, Caryl Adams initiated divorce proceedings; she obtained a divorce from Ronald Adams in April 1975.

Although initially Caryl Adams was very angry at Ocrant because she had not been informed concerning the Paine Webber account, she quickly became satisfied after talking with Ocrant that Ronald Adams, not Ocrant, was to blame. Ocrant and Caryl Adams became friends almost immediately after they met in December 1974. Ocrant visited Caryl Adams at her home several times a week, talked with her at least once a day, and brought her flowers and candy. He repeatedly assured her that her accounts were making her a great deal of money. He gave her advice on personal matters and, in December 1974, introduced her to a friend of his named Kermit Turley. Turley and Caryl Adams began dating each other and were married in November 1975.

In January 1975, the trust account at Paine Webber was placed on margin. In order to accomplish this, a modification of the original agreement creating the trust was necessary. An addendum was prepared for this purpose by William Fishman, an attorney to whom Ocrant had referred Caryl Adams. Caryl Adams testified that she did not remember signing the addendum and was not aware that the trust account had been margined until 1976. She thought that Fishman had merely assisted in the removal of Ronald Adams as one of the trustees of a different trust that had been established for her children.

In 1975, Caryl Adams closed out her savings account and placed the $21,000 from that account into her personal account at Paine Webber. She testified that she did this on Ocrant's recommendation after he advised her that he could make more money for her than the savings account was earning. By mid-1976, according to Caryl Adams, all of her assets, except for her house, and all of her children's trust assets had been placed in the two

Paine Webber accounts. Ocrant remained the account representative for the accounts from the time they were opened until August 25, 1976, when Caryl Adams "froze" all activity in both accounts. Caryl Adams took this action on the advice of her attorney in connection with dissolution of marriage proceedings that she initiated against Turley in August 1976. She closed the accounts in April 1977.

In March 1979, Caryl Adams filed suit, individually and as trustee of the Johnson trust, against Ocrant and Paine Webber. She alleged that from August 1973 through April 1977, Ocrant and Paine Webber owed fiduciary duties to her and induced her to rely on their skill and abilities and to trust wholly in them. In her first claim for relief, she alleged that Ocrant and Paine Webber breached their fiduciary duties by their conduct, including disbursing more than two million dollars out of the personal account in 1973 and 1974 without her knowledge or approval; selling large amounts of her ITW stock without her knowledge, and using the proceeds to invest in highly speculative, low-quality corporate bonds; trading in corporate bonds to a grossly excessive degree (a practice commonly known as "churning"); and managing the accounts more for the defendants' benefit and financial gain than for the benefit and gain of Caryl Adams and the Johnson trust. Caryl Adams requested, as compensatory damages, the difference between the income earned by the accounts and the income that would have been earned had Ocrant and Paine Webber pru-

dently managed the accounts; the profit made by Ocrant and Paine Webber in the form of commissions resulting from excessive trading; and other losses incurred in the accounts as a result of imprudent margin loans, rapid turnover of securities, and loss of principal because of imprudent investments.

Caryl Adams further alleged, in her second claim for relief, that Ocrant and Paine Webber were guilty of extreme and outrageous conduct which had caused her severe physical and emotional distress. Finally, in her third claim for relief, Caryl Adams averred that the defendants acted with wanton and reckless disregard of her rights and feelings, thus entitling her to exemplary damages.

Ocrant and Paine Webber denied that they owed any fiduciary duties to Caryl Adams and that their management of the two accounts was in any way improper. They also claimed as affirmative defenses that, among other things, Caryl Adams had ratified, acquiesced in, or consented to all the transactions effected by the defendants. Finally, they asserted that Caryl Adams' claim for punitive damages was barred by the statute of limitations.

The suit was tried to a jury. As part of her case, Caryl Adams presented a witness qualified as an expert in "stock and bonds analysis, trading and investment objectives," who testified that the trading in the two accounts was "grossly excessive,"[2] in-

2. The expert measured the amount of trading in the accounts in terms of "turnover," which he determined by dividing the dollar value of sales and purchases by the average equity in the accounts. Thus, for example, in 1974, $13,430,281 worth of securities were purchased and sold in the personal account and the average equity in the account was $656,443, resulting in a turnover rate of 2,045%. According to the expert, this means that the value of the account turned over 20.45 times in 1974, which was equivalent to the entire account being traded roughly every two and one-half weeks. Using this method of calculation, the expert calculated the turnover rate for the personal account in 1975 and 1976 to be 810% (8.1 times) and 764% (7.6 times) respectively. For the trust account, the turn-

over figures for 1975 and 1976 were 1439% (14.39 times) and 1726% (17.26 times) respectively.

The expert also measured turnover rate in both accounts by another method whereby purchases alone are divided by equity. The turnover rates under this method for the personal account were 925% (9.25 times) in 1974, 438% (4.38 times) in 1975, and 368% (3.68 times) in 1976, and for the trust account the rates were 821% (8.21 times) in 1975 and 869% (8.69 times) in 1976. According to this expert, a turnover rate of four, five, or six times is "way out of the bounds of prudence and normal or acceptable industry practice" for accounts such as those of Caryl Adams with investment objectives of income and long-term capital appreciation.

consistent with her stated objectives,[3] speculative in that many of the bonds traded were low-quality "junk" bonds, and consistent only with generating commissions. Another expert called by Caryl Adams concurred with this assessment of Paine Webber's handling of the account. Ocrant and Paine Webber, on the other hand, presented an expert who testified that the trading was "suitable," not excessive, and that Paine Webber's choice of securities was "perfectly proper." At the close of all the evidence, the trial court instructed the jury, over the defendants' objections, that Ocrant and Paine Webber owed fiduciary duties to Caryl Adams with regard to the personal account from December 12, 1974, to August 1976, and to the Johnson trust with regard to the trust account from January 12, 1975, to August 1976. The court allowed the jury to determine whether Ocrant and Paine Webber owed fiduciary duties at any other time and whether those duties were breached at any time. It also allowed the jury to determine whether the defendants' actions constituted extreme and outrageous conduct, and the amount of damages, if any, owed to Caryl Adams.

The jury found for Ocrant and Paine Webber on the outrageous conduct claim, but it returned a verdict for Caryl Adams on her claim for breach of fiduciary duties. It awarded her $625,000 in compensatory damages for the personal account and $230,000 in compensatory damages for the trust account. It also awarded $600,000 in punitive damages for each account, making a total award of $2,055,000. Ocrant and Paine Webber appealed and the court of appeals affirmed. We granted certiorari to determine whether the trial court erred when it instructed the jury that Ocrant and

Paine Webber owed Caryl Adams fiduciary duties during the times specified in the instructions. We also agreed to decide whether the trial court had jurisdiction to allow the jury to award punitive damages in this case. We address the latter question first.

## II.

Ocrant and Paine Webber contend that the trial court lacked subject matter jurisdiction to enter an award for exemplary damages in this case. According to the defendants, this action is one in equity and exemplary damages are unavailable in such an action. Thus, the defendants contend, the trial court had no power to enter the exemplary damages judgment.

Ocrant and Paine Webber did not raise the issue of the trial court's jurisdiction to award exemplary damages at trial, in their motion for a new trial, or in their briefs before the court of appeals. In her brief to this court, Caryl Adams represents that Paine Webber first raised this issue three weeks prior to oral argument in the court of appeals. As best we can determine, this representation refers to a supplemental brief that was filed by Paine Webber shortly before oral argument and then later was stricken by the court of appeals. In any event, the court of appeals did not address in its opinion the issue of the trial court's jurisdiction to award punitive damages, and the issue never came to the trial court's attention at all. The defendants' only challenges below to the punitive damages award consisted of their contentions that such an award was unsupported by the evidence and was barred by the statute of limitations.[4]

---

3. Several documents in Paine Webber's possession during the existence of the accounts indicated that the investment objectives for the personal account were income accumulation and capital appreciation, and for the trust account the objectives were investment in "investment grade" or high-quality bonds, income production and capital gains. One of Caryl Adams' experts testified that the only possible objective Ocrant and Paine Webber achieved through their course of trading was "speculation."

4. The defendants contended that a claim for punitive damages, available in Colorado in accordance with § 13–21–102, 6 C.R.S. (1973), is actually an action for a "penalty or forfeiture of any penal statute," which according to § 13–80–104, 6 C.R.S. (1973), must be commenced within one year after the offense giving rise to the claim is committed. The trial court and the court of appeals correctly rejected this argument, which we also recently rejected in *Palmer*

■ As a general rule, issues not presented in the trial court are deemed waived and cannot be raised on appeal. *Christensen v. Hoover*, 643 P.2d 525, 531 (Colo.1982); *Matthews v. Tri-County Water Conservancy District*, 200 Colo. 202, 206, 613 P.2d 889, 892 (1980); *McMullin v. Magnuson*, 102 Colo. 230, 244–45, 78 P.2d 964, 971 (1938). An exception to this rule applies when a party challenges a court's jurisdiction over the subject matter of the action before it. As we have noted in the past, "the defense of lack of jurisdiction over the subject matter can be raised at any time, even for the first time in this Court." *Triebelhorn v. Turzanski*, 149 Colo. 558, 561, 370 P.2d 757, 759 (1962); *accord Peaker v. Southeastern Colorado Water Conservancy District*, 174 Colo. 210, 213, 483 P.2d 232, 233 (1971); *see also* C.R.C.P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.")

■ The basis for allowing a challenge to subject matter jurisdiction to be raised for the first time on appeal is to be found in the doctrine that the judgments of a court acting outside of the limits of the constitutional and statutory provisions defining its subject matter jurisdiction are void. *McLeod v. Provident Mutual Life Insurance Co.*, 186 Colo. 234, 237, 526 P.2d 1318, 1321 (1974); R. Casad, *Jurisdiction in Civil Actions* Para. 1.01[1] (1983). Thus, if, as the defendants claim, there is some question as to the trial court's subject matter jurisdiction in this case, that question can be reviewed by this court. However, despite the defendants' efforts to characterize their challenge to the award of exemplary damages as based upon the subject matter jurisdiction of the court, their arguments do not call into question the trial court's jurisdiction over subject matter.

We have said that subject matter jurisdiction concerns "the court's authority to deal with the class of cases in which it renders judgment." *In re Marriage of Stroud*, 631 P.2d 168, 170 (Colo.1981). "A court is said to have jurisdiction of the subject matter of an action if the case is one of the type of cases that the court has been empowered to entertain by the sovereign from which the court derives its authority." R. Casad, *supra*. It is the authority to decide a case, not the correctness of the decision, which makes up jurisdiction. *McLeod v. Provident Mutual Life Insurance Co.*, 186 Colo. at 241, 526 P.2d at 1322.

The present suit was tried in Denver District Court. The district courts in Colorado derive their authority from article VI, section 9, of the Colorado Constitution, which states in part that "[t]he district courts shall be trial courts of record with general jurisdiction, and shall have original jurisdiction in all civil, probate, and criminal cases [except for certain limited matters, including some probate cases, to be heard by the Denver probate court]." As courts of general jurisdiction, the district courts in Colorado have the authority to consider questions of law and of equity and to award legal and equitable remedies. *See* C.R.C.P. 2 ("There shall be one form of action to be known as 'civil action.'"); *McKenzie v. Crook*, 110 Colo. 29, 32, 129 P.2d 906, 907 (1942) (holding that C.R.C.P. 2 abolishes the distinction between actions at law and in equity).

The defendants, through their pleadings, did nothing to limit the district court to the exercise of only its equitable jurisdiction, nor did they object to Caryl Adams' request for a jury trial, a form of trial that is available only in actions at law. *See Kaitz v. District Court*, 650 P.2d 553, 555 (Colo. 1982). Thus, the real issue as to punitive damages in this case does not involve the trial court's power to award such damages while staying within its jurisdiction, but rather the issue is whether the present action was an equitable one, and if so, whether exemplary damages are available

*v. A.H. Robins Co., Inc.*, 684 P.2d 187, 213–14 (Colo.1984).

as a remedy.[5] This issue, properly framed, does not involve a challenge to the trial court's subject matter jurisdiction and since it was not raised before the courts below, must be deemed waived. *See McMullin v. Magnuson*, 102 Colo. at 244–45, 78 P.2d at 971.

### III.

Ocrant and Paine Webber contend that the trial court erred in giving the jury instruction no. 13, which states:

> The Court has determined, as a matter of law, that the defendants, Paine Webber and Lawrence Ocrant, owed the plaintiff fiduciary duties on her individual account from December 12, 1974, and on the V.M. Johnson 1962 Trust as Trustee from January 12, 1975, to and including the time the accounts were frozen by her in August of 1976. You may consider this fact as established.

The Court's determination that the defendants owed fiduciary duties to Mrs. Adams from December 12, 1974, to August, 1976, should not influence you in determining whether the defendants owed a fiduciary duty to Mrs. Adams prior to December 12, 1974, or in determining whether the defendants breached their fiduciary duties.[6]

According to the defendants, the question of whether Ocrant and Paine Webber had entered into a fiduciary relationship with Caryl Adams was one of fact for the jury to decide and was dependent upon a finding that the defendants, and not Caryl Adams, exercised continuing control over the trading and investments in Adams' accounts. The defendants contend that the trial court correctly recognized that control of the customer's account by the stockbroker is the crucial factor in determining the existence of a fiduciary relationship between a stockbroker and its customer,[7] but that the trial court erred in determining the existence of such a relationship as a matter of law.[8]

---

**5.** In *Kaitz v. District Court*, 650 P.2d 553, 556 (Colo.1982), we held that punitive damages are not available in actions in equity. *See also Miller v. Kaiser*, 164 Colo. 206, 215, 433 P.2d 772, 776–77 (1967); *Littlejohn v. Grand International Brotherhood of Locomotive Engineers*, 92 Colo. 275, 276–77, 20 P.2d 311 (1933). However, we did not decide in *Kaitz*, as Ocrant and Paine Webber now assert, that all actions involving a claim for breach of fiduciary duties are equitable, not legal, in nature.

In *Kaitz*, we held that an action for breach of fiduciary duties brought by the beneficiaries of several guardianship estates against the guardian of the estates was one in equity. We noted that "[a]ctions by a beneficiary or ward against a trustee or guardian in an existing trust or guardianship are *generally, but not always*, equitable in nature." *Id.* at 555 (emphasis added). Thus, *Kaitz* does not foreclose the real possibility that certain fiduciary duty claims can be tried at law, and the court of appeals has recognized that possibility since *Kaitz* was decided. *See Mahoney Marketing Corp. v. Sentry Builders of Colorado, Inc.*, 697 P.2d 1139 (Colo.App.1985); *Holter v. Moore & Co.*, 681 P.2d 962 (Colo.App. 1983).

**6.** To assist the jury in determining whether the defendants owed fiduciary duties to Caryl Adams prior to December 12, 1974, the trial court gave the following instruction:

> A fiduciary relationship exists wherever a person in the position of a stockbroker has the

legal power to affect the interests of his customer or to control the purchases and sales of securities which have been entrusted to him. Such a person is under a duty to deal with his customer with the utmost good faith and loyalty. The broker must make full and complete disclosure of all facts which may be material for his customer to know.

Instruction no. 14.

**7.** The defendants state that instruction no. 14, *see* note 5, *supra*, evidences the trial court's recognition of "control" as the determinative factor.

**8.** In closing argument, defense counsel acknowledged that Paine Webber had a fiduciary duty to Caryl Adams from December 7, 1974, onward. He told the jury:

> There is no question—and I am here to tell you Paine Webber acknowledges and states that it owed a fiduciary duty to Mrs. Adams when she was operating this account from December 7, 1974, onward. No one denies that. It is up to you to determine whether or not there was any fiduciary duty prior to that time....

The defendants argue that this was not a concession by which they are now bound, *but cf. Most Worshipful Prince Hall Grand Lodge v. Most Worshipful Hiram Grand Lodge*, 86 Colo. 330, 348–49, 282 P. 193, 200 (1929) (parties bound by admission of fact at trial), but simply a recogni-

Caryl Adams, on the other hand, asserts that the evidence presented at trial supported the trial court's conclusion that both Ocrant and Paine Webber owed Adams fiduciary duties during the times specified in instruction no. 13. Caryl Adams argues that the existence of such duties can be proved by evidence that a stockbroker controlled a customer's account, or by evidence that the customer placed her trust and confidence in the broker, or even by showing the mere existence of a stockbroker/customer relationship. Regardless of the test applied, according to Adams, the evidence in this case established as a matter of law the existence of a fiduciary relationship between the defendants and her during the times specified in instruction no. 13.

The court of appeals recognized that "neither the factors comprising a fiduciary relationship between a stockbroker and a customer, nor the test to be applied, have been specifically addressed in this jurisdiction." *Adams v. Paine, Webber, Jackson & Curtis, Inc.*, 686 P.2d at 800. The court of appeals held that "if the facts show that the relationship between stockbroker and customer is accompanied by proof of the customer's trust and confidence in the broker, a fiduciary relationship is created." *Id.* Describing the evidence of such trust and confidence in this case as "overwhelming," the court of appeals concluded that the trial court correctly took the determination of fiduciary relationship away from the jury.

Our review of this conclusion requires a two-step inquiry. First, we must determine the proper test to be used to ascertain whether a fiduciary relationship exists between a stockbroker and the broker's customer. Then we must apply that test to

the record in order to decide whether the facts at hand established a fiduciary relationship as a matter of law or whether that determination should have been left to the jury. Although we adopt a somewhat different test from the "trust and confidence" standard utilized by the court of appeals to determine the existence of a fiduciary relationship between stockbroker and customer, we agree that the trial court was correct in directing the jury that a fiduciary relationship had been established as a matter of law during the periods specified in instruction no. 13.

### A.

Our past cases have not addressed the question of when a stockbroker or brokerage firm owes fiduciary duties to a customer. Several other state courts and many federal courts have considered this matter and an examination of their resolutions of the question is helpful.

Preliminarily, there can be no question but that every stockbroker has at least the limited duty to serve a customer's financial interest within the framework of each transaction for the purchase or sale of a security in the customer's account. *Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 461 F.Supp. 951 (E.D.Mich.1978).[9] The issue in the present suit, and the one to which the cases that we now examine give their attention, is whether and under what circumstances a broker becomes a fiduciary of a customer in a broad sense. This is important because a broker that has such a fiduciary relationship with its customer has wide-ranging duties in managing the customer's account in accordance with the customer's needs and objectives. *Leib*, 461 F.Supp. at 953. The duties of a broker in a

---

tion of the fact that the judge had already instructed the jury that Paine Webber had fiduciary duties to Caryl Adams during that time. In view of our determination that the court's instruction no. 13, taking the issue of fiduciary duties from the jury for certain periods of time was proper, we need not determine whether the defendants are bound by their counsel's "concession" in closing argument.

9. This not to suggest that courts necessarily agree on the nature and scope of a broker's duties even when limited to the framework of particular transactions. *Compare Leib*, 461 F.Supp. at 952 (describing broad duties with respect to the execution of transactions) *with Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 337 F.Supp. 107 (N.D.Ala.1971) (suggesting duties of a more limited nature).

fiduciary status are not at an end when a transaction is completed; they include a continuing duty to keep abreast of financial information that may affect the customer's portfolio and to act on the basis of that information. *Id.*

Although a few courts have stated without qualification that a securities broker stands in a fiduciary relationship with its client, *e.g., Marchese v. Shearson Hayden Stone, Inc.,* 734 F.2d 414, 418 (9th Cir. 1984); *Leuzinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 396 S.W.2d 570, 575–76 (Mo.1965), many more have rejected a *per se* imposition of fiduciary duties on stockbrokers, *e.g., Fey v. Walston & Co.,* 493 F.2d 1036, 1049 (7th Cir.1974), and have held that the fiduciary nature of a broker-customer relationship is a factual issue, *e.g., id.; Kaufman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 464 F.Supp. 528, 536 (D.Md.1978). This latter holding is consistent with our decision in *Tschudy v. Amos C. Sudler & Co.,* 158 Colo. 421, 426, 407 P.2d 877, 879 (1965), in which we stated that whether an underwriter of an over-the-counter stock issue had a fiduciary relationship with the purchaser of some of the stock was a question for the trier of fact.

In determining the existence and extent of a particular broker's fiduciary obligations, many courts have considered the degree of control the stockbroker exercised over the customer's account to be the determinative factor. *Leib,* 461 F.Supp. 951; *Berki v. Reynolds Securities, Inc.,* 277 Or. 335, 560 P.2d 282 (1977). For example, one court has stated that "[i]t is where the agent 'for all practical purposes' controls the account that [the] law imposes fiduciary obligations." *Leboce, S.A. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 709 F.2d 605, 607 (9th Cir.1983). Some courts examine the extent of control exercised by the broker in terms of whether the customer's account is "discretionary," meaning that the broker makes all the investment decisions, or "nondiscretionary," meaning that the customer rather than the broker determines which purchases and sales to make. The courts that make this distinc-

tion generally hold that a broker who handles a discretionary account becomes a fiduciary of his customer in a broad sense, *Leib,* 461 F.Supp. at 953; *Rupert v. Clayton Brokerage Co. of St. Louis, Inc.,* 705 P.2d 988, 990–91 (Colo.App.1985); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Boeck,* 127 Wis.2d 127, 377 N.W.2d 605, 608 (1985), whereas a broker who handles a nondiscretionary account is generally held to narrower duties of care, *Greenwood v. Dittmer,* 776 F.2d 785, 788 (8th Cir.1985); *Caravan Mobile Home Sales, Inc. v. Lehman Bros. Kuhn Loeb, Inc.,* 769 F.2d 561 (9th Cir.1985); *Walston & Co. v. Miller,* 100 Ariz. 48, 410 P.2d 658, 661 (1966); *Boeck,* 377 N.W.2d at 608.

In assessing the existence of control by a broker, courts have not limited the scope of their vision to the documentation pursuant to which a customer's account is maintained, but instead have examined how account transactions have actually been conducted. Thus, it has been held that a broker could usurp control over a technically nondiscretionary account, rendering that broker subject to the same fiduciary duties as if the account had been discretionary from its creation. *Leib,* 461 F.Supp. at 954. The closely related criterion of a broker's "involvement" in transactions in a customer's account also has been considered material in resolving the factual question of the existence of a fiduciary duty. *Kaufman,* 464 F.Supp. at 536. If a broker has acted as an investment advisor, and particularly if the customer has almost invariably followed the broker's advice, this is an indication that the broker exercises functional control of the account and that the broker-customer relationship is fiduciary. *See Leboce,* 709 F.2d at 607–08; *Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 337 F.Supp. 107 (N.D.Ala.1971); *Hecht v. Harris, Upham & Co.,* 283 F.Supp. 417, 433 (N.D.Cal.1968); *Twomey v. Mitchum, Jones & Templeton, Inc.,* 262 Cal.App.2d 690, 69 Cal.Rptr. 222 (1968). On the other hand, a broker who merely receives and executes a customer's orders does not exercise a degree of control that suggests the

recognition of a fiduciary relationship with the customer. *Leboce,* 709 F.2d at 607–08; *Robinson,* 337 F.Supp. 107; *Berki,* 560 P.2d at 286.

Also considered indicative of control by a broker is trading by the broker without the customer's prior approval. *Leib,* 461 F.Supp. at 954. Frequent communications between the broker and the customer concerning the status of the account or the prudence of particular transactions, however, suggest absence of control by the broker. *Id.*

Another significant factor in the determination of whether a broker controls a customer's account is the investment sophistication of the customer, since an inexperienced or naive customer is more likely to leave the control of an account in the broker's hands. *Kaufman,* 464 F.Supp. at 536; *Leib,* 461 F.Supp. at 954; *Hecht,* 283 F.Supp. at 433. Conversely, a customer who has sufficient understanding and intelligence to be able to evaluate a broker's recommendations and exercise independent judgment as to those recommendations can be viewed as controlling the account. *Follansbee v. Davis, Skaggs & Co.,* 681 F.2d 673 (9th Cir.1982); *Marshak v. Blyth Eastman Dillon & Co., Inc.,* 413 F.Supp. 377 (N.D.Okla.1975). Thus, for example, the court in *Leib* considered the customer's age, education, intelligence, and investment experience as among the relevant considerations in determining that the customer was sufficiently involved in and informed about his account to be deemed in control of the account. 461 F.Supp. at 954. Additionally the court noted that if the broker is socially or personally involved with the customer, this suggests relinquishment of control by the customer because of the relationship of trust and confidence. *Id.*

The concern with the investment acumen of the particular customer permeates almost all of the opinions in this area, including those that consider proof of the customer's trust and confidence in the broker in itself to be indicative of a fiduciary relationship. *E.g., Stevens v. Abbott, Proctor & Paine,* 288 F.Supp. 836 (E.D.Va.1968);

*Boonstra v. Stevens-Norton, Inc.,* 64 Wash.2d 621, 393 P.2d 287 (1964); *see Walston & Co.,* 410 P.2d at 661. The courts that consider trust and confidence as an independent basis for creation of a fiduciary relationship appear to recognize that by gaining the confidence of a relatively uninformed customer and purporting to advise that person and to act on that person's behalf, a broker accepts greater responsibility to that customer. *See Boeck,* 377 N.W.2d at 613 (Abrahamson, J., concurring). This is consistent with our holding, in an action involving a real estate brokerage corporation and its client, the seller of property, that a fiduciary relationship exists when "there is special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to interests of one reposing the confidence." *Circle T Corp. v. Deerfield,* 166 Colo. 238, 245, 444 P.2d 404, 408 (1968); *see also* S. Goldberg, *Fraudulent Broker-Dealer Practices* § 8.4 (1978) (A complete fiduciary relationship is formed "when the parties come to the understanding that the broker or dealer will be acting primarily for the benefit of the investor and the investor places trust and confidence in such understanding.").

In adopting a standard by which to determine the existence of a fiduciary relationship between a broker and a customer, we are conscious of the need to protect those customers who for all practical purposes relinquish control over their investment decisions to their brokers and place their confidence in their brokers' superior knowledge and level of experience. At the same time, we recognize that brokers should not be the insurers of their customers' accounts.

 Balancing these considerations, we decline to adopt a rule that a stockbroker/customer relationship is, *per se,* fiduciary in nature. Instead we hold that proof of practical control of a customer's account by a broker will establish that the broker owes fiduciary duties to the customer with regard to the broker's handling of the customer's account. Evidence that the

customer has placed trust and confidence in the broker, with the broker's knowledge, to manage the customer's account for the customer's benefit will be indicative of the existence of a fiduciary relationship but will not, by itself, establish that relationship. Although in a context involving a real estate broker and a seller we have recognized evidence of trust and confidence as an independent means of establishing a fiduciary relationship, *Circle T Corp. v. Deerfield*, 166 Colo. at 245, 444 P.2d at 408, there is no need to do so here.[10] In the present context, trust and confidence are so closely related to control that when a customer reposes such a degree of trust and confidence in a broker as to suggest a fiduciary relationship, the broker will almost invariably have functional control over the customer's account. Furthermore, in the final analysis, it is the ability to control transactions in the customer's account that gives rise to the need to provide those protections to the customer that inhere in recognition of fiduciary duties in the broker.

Since proof of circumstances of control is necessary to elevate an ordinary broker-customer relationship to one that is fiduciary in nature, the question of whether the broker in a given case owes fiduciary duties to a particular client must be resolved on a case-by-case basis. We must determine next whether the evidence in the present case established as a matter of law that the defendants had fiduciary duties to Caryl Adams as the court instructed the jury by instruction no. 13.

### B.

Ordinarily, it is the jury that must assess the credibility of witnesses, evaluate the weight of evidence, and determine the facts. *Kiefer Concrete, Inc. v. Hoffman*, 193 Colo. 15, 20, 562 P.2d 745, 748 (1977). However, a directed verdict is proper, even when it is dependent upon a determination of fact, where there is no substantial con-

flict in the evidence and the evidence introduced is susceptible of only one interpretation by reasonable persons. *Liber v. Flor*, 160 Colo. 7, 13, 415 P.2d 332, 336 (1966); *see Little Thompson Water Association v. Strawn*, 171 Colo. 295, 300, 466 P.2d 915, 917 (1970). The trial court should take an issue from the jury only in the absence of evidence upon which a jury could justifiably determine the issue for the party opposing the directed verdict. *Tri-Aspen Construction Co. v. Johnson*, 714 P.2d 484, 487 (Colo.1986). A mere scintilla of evidence, however, is not enough to require the submission of an issue to the jury. *Farr Co. v. Union Pacific Railroad*, 106 F.2d 437, 439 (10th Cir.1939). In deciding whether to direct a verdict, the evidence must be viewed in the light most favorable to the party resisting the direction of a verdict. *Tri-Aspen*, 714 P.2d at 486.

In instruction no. 13, the trial court in the present case implicitly recognized that the existence of a fiduciary relationship is a question of fact, but the judge took this factual issue away from the jury and decided, as a matter of law, that Ocrant and Paine Webber owed fiduciary duties to Caryl Adams as to her personal account after December 12, 1974, and as to the account for the Johnson trust after January 12, 1975. The judge allowed the jury to determine the remaining factual issues involved in the case, including whether Ocrant and Paine Webber had fiduciary obligations prior to the times specified and whether Ocrant and Paine Webber breached their fiduciary duties at any time.

■ In accordance with the test for determining the existence of a fiduciary relationship that we adopt today, the trial court was correct in resolving this question as a matter of law only if the evidence, viewed in the light most favorable to Ocrant and Paine Webber, reasonably could admit only of the conclusion that, for all practical purposes, Ocrant exercised control over Caryl Adams' two accounts. We believe that the

**10.** We do not intend to cast into question the reasoning or the result in *Circle T Corp. v.*

*Deerfield.*

evidence, even viewed most favorably to the defendants, conclusively demonstrates that Ocrant controlled the two accounts. Thus we conclude that the trial court acted properly when it instructed the jury that as a matter of law, Ocrant and Paine Webber owed fiduciary duties to Caryl Adams during the specified periods of time.

Although none of the parties has attached the label of "discretionary" or "nondiscretionary" to the Adams' accounts, and the documents by which the accounts were established and maintained do not classify them as discretionary, the discretionary manner in which the accounts were managed is clear from the record. Ocrant arranged all purchases and sales of securities and executed those transactions when he deemed appropriate. Caryl Adams received confirmation slips in the mail following each transaction, theoretically giving her sufficient information to reverse any transaction she disapproved. There is no evidence in the record, however, to indicate that she or anyone on her behalf ever ordered a transaction rescinded, or even questioned Ocrant about a particular transaction after December 12, 1974, when Ronald Adams introduced Caryl Adams to Ocrant. Nor is there anything to indicate that she ever told Ocrant to buy or sell a particular stock or bond. Thus, although Caryl Adams technically retained the power to halt or to increase the activity in her account,[11] the evidence demonstrates beyond question that Ocrant, and not Caryl Adams, directed that activity at all times after December 12, 1974.[12]

Besides receiving as many as five confirmation slips a day, Caryl Adams also received, from Paine Webber, computerized monthly statements describing the activity in her accounts, and, from Ocrant, monthly "summaries" of the accounts for several months in 1975. Caryl Adams testified that she did not read the monthly statements because Ocrant had told her she did not need to read them. She testified that she did not understand the summaries. We are not convinced that Caryl Adams' receipt of statements and other information that she was unable to understand or digest undercuts the conclusion that Ocrant controlled her account. *See Kravitz v. Pressman, Frohlich & Frost, Inc.,* 447 F.Supp. 203, 211 (D.Mass.1978); *Hecht,* 283 F.Supp. at 434. This is particularly true in light of the testimony of one of the defendants' witnesses that the summaries sent by Ocrant lacked important information and did not inform Caryl Adams as to whether her accounts were losing or making money.

The record does show that Ocrant and Caryl Adams were in frequent communication. However, there is nothing in the record that suggests that Ocrant imparted meaningful information concerning the status of her account or consulted her about investment strategy or the advisability of particular transactions. The only information about the content of the communications is that Ocrant frequently assured Caryl Adams that the accounts were doing well and making a lot of money for her.

Furthermore, the evidence of Caryl Adams' investment naivete and inexperience was uncontroverted. Both she and her mother testified that she had no training in business or finance and that her father had prohibited her from taking "men's courses," such as accounting, in college. She was in her early forties at the time of trial and had four children, ranging in age from seven to sixteen. Her work experience outside of the home consisted primarily of modeling. She testified that during her marriage to Ronald Adams, she left all "financial things" to him. At the time of trial, her total personal experience in initiating an investment transaction consisted of the purchase of one share of Pepsi-Cola stock for Ronald Adams' birthday present.

---

**11.** The jury was instructed as to waiver, ratification, and estoppel, but declined to withhold judgment for Caryl Adams on any of those theories.

**12.** The trial court determined that the fiduciary duties with respect to the trust account began on January 12, 1975, although those duties with respect to the personal account began on December 12, 1974.

As discussed above, several courts have recognized that a customer's lack of investment sophistication is one factor indicating the existence of control by a broker. *E.g., Leib*, 461 F.Supp. at 954. One court has noted that even where a customer has enough sophistication to be aware that her account is actively traded or that particular securities are being favored, she may not be able to comprehend that her account is being *excessively* traded. *Hecht*, 283 F.Supp. at 434–35. In the present case, the record convincingly establishes that Caryl Adams did not have the expertise to understand what was occurring in her accounts and, in fact, did not understand.

The defendants assert that the evidence indicating that Ocrant controlled Adams' accounts is undermined by evidence that, in the words of the defendants' opening brief in this court, Caryl Adams "was constantly attended to by a plethora of experienced professionals who were familiar with [her] affairs and who were either directly advising her or were available to do so." The professionals to whom the defendants refer are Robert Appel, William Fishman, James Weist, and Kermit Turley. After reviewing the record for evidence of the involvement of these men in the management of the Adams' accounts, we are convinced that a jury could not have determined that any of them altered the relationship between Ocrant and Caryl Adams.

Robert Appel was employed by Caryl Adams for less than two months, starting in December 1974. He was hired to handle Caryl Adams' divorce and to check on the status of her ITW stock and other assets and liabilities. He also helped procure a revocation of the power of attorney she had executed for Ronald Adams with respect to her individual account at Paine Webber. Appel met with Ocrant, who supplied him with summaries of the money that had gone in and out of the personal account and with some of the monthly statements, which Appel "started" to review. Although the evidence indicates that Appel was aware of activity in the account and discussed the account with Caryl Adams, there is nothing in the record to indicate that Appel offered advice about the account, questioned the handling of the account, or in any way assessed the appropriateness of the trading history reflected in the record of the personal account. Nor is there any indication that Appel even was aware of the existence of the trust account.

William Fishman, an attorney specializing in securities, was recommended to Caryl Adams by Ocrant. Ocrant testified that he sent Caryl Adams to see Fishman in regard to drafting the documents necessary to place the trust account on margin, but Caryl Adams testified that Ocrant merely advised her to hire Fishman as a "go-getter" attorney who would handle her marriage dissolution forcefully. In fact, Fishman referred her to yet another attorney to represent her in the marriage dissolution proceedings and limited his own efforts on her behalf to securities matters. Fishman testified that he discussed Caryl Adams' personal account with her on numerous occasions, explained to her the concepts of margining and of accrued interest as it relates to transactions in bonds, and prepared a summary of her account activity. He admitted that he did not analyze Caryl Adams' account for her, nor did he advise her as to the propriety of the transactions occurring. He did not review the computerized monthly statements from Paine Webber. Although he knew that Ocrant and Caryl Adams were "very close" and he felt that Caryl Adams had a good deal of confidence in Ocrant, there is no indication that he ever discouraged that confidence or attempted to question or direct any of the activity in the accounts. He did testify that he frequently admonished Caryl Adams to "watch her accounts." At most, the record would support a determination that Fishman raised Caryl Adams' level of investment sophistication somewhat, but he did not alter Ocrant's control over the account.

James Weist, an accountant with Arthur Andersen & Company, was employed by Caryl Adams on Ocrant's recommendation in 1975 to prepare her 1974 tax return. He also prepared her individual return and

that of the Johnson trust for 1975 and 1976. His involvement with both the personal account and the trust account consisted of determining the tax consequences of the transactions in the accounts. Nothing in the record indicates that Weist offered any investment advice to Caryl Adams or to Ocrant, or that he attempted to influence the handling of the accounts in any way.

Finally, Kermit Turley, Caryl Adams' second husband, testified that he gave Caryl Adams investment advice during their marriage and that, using the monthly statements and the confirmation slips, he prepared a "partial" accounting of the transactions in the trust account and perhaps in the individual account as well. Turley had been a stockbroker and had some investment experience. Caryl Adams signed a power of attorney giving Turley authority with respect to her personal account. The marriage, however, did not go well from the outset, and dissolution proceedings were begun less than a year after the wedding. There is no evidence in the record to show that Turley's presence affected the trading in the accounts or Caryl Adams' reliance on Ocrant.

Other courts that have been willing to impute the knowledge or expertise of a third party to a customer have done so on the basis of evidence that the third party, usually the customer's husband or son, was acting as the customer's agent and have done so, not for the purpose of determining whether the broker and customer had a fiduciary relationship, but rather for the purpose of holding that the customer, through the third party's involvement, had ratified the actions of the broker or was estopped to complain. *E.g., Ocrant v. Dean Witter & Co.*, 502 F.2d 854 (10th Cir.1974); *Altschul v. Paine, Webber, Jackson & Curtis, Inc.*, 518 F.Supp. 591 (S.D.N.Y.1981); *Marshak*, 413 F.Supp. 377. The jury here resolved the ratification and estoppel issues against the defendants. Our review of the record concerning Caryl Adams' relationships with Appel, Fishman, Ocrant, and Turley during the relevant time periods does not alter our conclusion that Ocrant controlled her accounts and a jury could not have found otherwise.

For the foregoing reasons, we conclude that reasonable persons could not help but believe that Ocrant, and not Caryl Adams, exercised control over Adams' two accounts, and thus, the trial court's instruction to the jury was justified. As additional support for the conclusion that Ocrant controlled Caryl Adams' account, and consequently for the instruction, the record demonstrates conclusively that Caryl Adams placed her trust and confidence in Ocrant and Paine Webber after meeting Ocrant in December 1974 and that the defendants knew of that trust and confidence.

Both Caryl Adams and Ocrant testified that the two developed a close personal and social relationship soon after they met. Ocrant admitted that he visited Caryl Adams frequently and that these visits were primarily social. Ocrant introduced Caryl Adams to Kermit Turley, her second husband, and was best man at their wedding. Caryl Adams consulted William Fishman, an attorney to whom Ocrant had introduced her, to implement Ocrant's suggestion that an antenuptial agreement be prepared and executed before Caryl Adams and Turley were married. One provision of the agreement directed Caryl Adams to seek the advice of Ocrant or Fishman before loaning any money to Turley. When Caryl Adams later sought their advice on the matter, Ocrant suggested that she lend $60,000 to Turley. Turley then placed this $60,000 into an account at Paine Webber. The account executive on the account was Ocrant.

In addition to developing this relationship of trust and confidence on a personal level, Ocrant induced Caryl Adams' trust and confidence in business matters. Ocrant testified that he never held himself out to be an "investment advisor," but he admitted that he told Caryl Adams not to worry about her account because he was making money for her. This testimony was resoundingly corroborated by Caryl Adams and her mother, who both testified that on numerous occasions, Ocrant told them not to worry because he was taking care of Caryl and her accounts and she was mak-

ing a great deal of money. Finally, Caryl Adams testified that Ocrant advised her not to buy real estate or insurance, and to place her savings in her Paine Webber account because he could make more money for her that way. The evidence demonstrating that Caryl Adams placed trust and confidence in the business expertise of Ocrant and Paine Webber with their knowledge and encouragement from December 1974 until August 1976 is not only "overwhelming," as the court of appeals determined, but also essentially uncontroverted.[13] This evidence bolsters our earlier conclusion that Ocrant controlled Caryl Adams' accounts.

The trial court did not err when it instructed the jury that Ocrant and Paine Webber owed fiduciary duties to Caryl Adams and to the Johnson trust from, respectively, December 12, 1974, and January 12, 1975, to August 1976. The judgment of the court of appeals is affirmed.

ROVIRA, J., concurs in part and dissents in part.

ROVIRA, Justice, concurring in part and dissenting in part:

I agree with that part of the majority opinion which concludes that the defendants waived their right to contest the award of exemplary damages. I respectfully dissent from that part of the opinion which holds that the trial court was correct in directing the jury that a fiduciary relationship had been established as a matter of law. See majority op. at 515.

Although I agree with the majority's conclusion that "proof of practical control of a customer's account by a broker will establish that the broker owes fiduciary duties to the customer with regard to the broker's handling of the customer's account," majority op. at 517, I do not agree that the evidence in this case meets the standard for granting a directed verdict set forth in

our previous decisions. Consequently, I believe that the trial court committed reversible error in taking from the jury the issue of whether defendants owed the plaintiff fiduciary duties during the periods set forth in Instruction No. 13.

The majority recognizes that "the existence of a fiduciary relationship is a question of fact." Majority op. at 518; *see also Tschudy v. Amos C. Sudler & Co.,* 158 Colo. 421, 426, 407 P.2d 877, 879 (1965). The question of whether a fiduciary relationship exists will, in turn, "almost invariably" rest on a determination of whether the broker has "functional control" over the customer's account. *Id.* The majority sets forth four related factors to be used in assessing the existence of control by a broker. Majority op. at 516–517. First, a court must examine the manner in which account transactions have actually been conducted. Second, the court must look to the broker's "involvement" in transactions in a customer's account. In other words, the court must determine whether, and to what degree, the broker has acted as an investment adviser rather than merely as an order taker. Third, the court must look to whether the broker may initiate trading without prior customer approval. Finally, in determining the existence of control, the court should consider the sophistication of the customer. In addition to these factors, the majority also notes that whether the relationship between broker and customer is one of trust and confidence is "closely related" to a determination of control. Majority op. at 518.

The majority also notes three factors which, if present, indicate that the broker did not exercise control. First, control is unlikely where the broker merely receives and executes the customer's orders. Majority op. at 517. Second, "Frequent communication between the broker and the customer concerning the status of the account

---

**13.** Certainly, isolated bits of evidence can be mustered from the extensive record to suggest that not every relevant fact is absolutely uncontroverted. Nevertheless, our review of the record causes us no hesitancy in concluding that, viewing the evidence in the light most favorable to the defendants, and applying the correct legal standards, the evidence in this case is susceptible of no conclusion other than that the defendants were in a fiduciary relationship with Caryl Adams during the relevant times. *See Tri-Aspen Construction Co. v. Johnson,* 714 P.2d 484 (Colo.1986); *Liber v. Flor,* 160 Colo. 7, 415 P.2d 332 (1966).

... suggest absence of control." *Id.* Finally, a relatively high degree of customer sophistication, as measured by the customer's age, education, intelligence, and investment experience indicates that the customer has retained control of the account. Majority op. at 517.

As the majority acknowledges, a directed verdict is only appropriate where the evidence introduced is susceptible to only one interpretation by a reasonable person and only in the absence of evidence upon which a jury could determine the issue for the party opposing the directed verdict. Majority op. at 518. When considering a motion for directed verdict, the court must view the evidence, including every reasonable inference to be drawn from that evidence, in the light most favorable to the party against whom the motion is directed. *Safeway Stores v. Langdon*, 187 Colo. 425, 429–30, 532 P.2d 337, 340 (1975); *McGlasson v. Barger*, 163 Colo. 438, 442, 431 P.2d 778, 779 (1967). "A motion for directed verdict can only be granted where the evidence, when so considered, compels the conclusion that the minds of reasonable men could not be in disagreement and that no evidence, or legitimate inference arising therefrom, has been received or shown upon which a jury's verdict against a moving party could be sustained." *Safeway Stores*, 187 Colo. at 430, 532 P.2d at 340.

The parties presented a great deal of evidence bearing on the factors used to determine control. Although that evidence suggests the presence of a number of factors that lead to an inference of control, such as the broker's authority to initiate transactions without prior approval and the fact that the broker served as an investment advisor, *see* majority op. at 519–520, the record also contains evidence that, when considered in the light most favorable to the defendants, tends to establish two of the factors which negate the inference of control.

First, Caryl Adams' communications and involvement with a number of professionals who were highly experienced in the area of investment and finance could sup-port an inference that Adams either made use of their investment experience and knowledge or increased her own level of sophistication. In particular, the record shows that Adams had "over a hundred" conversations with William Fishman, an attorney specializing in securities, starting in January 1975. Fishman's testimony reveals a painstaking effort to teach Adams how to understand and follow the trading in her account. In that effort, Fishman used the summaries sent by Ocrant to Adams to illustrate sophisticated concepts such as purchasing on margin, differentiation between different types of interest rates, and determinations of equity and profitability. These conversations would support the view not only that Adams may have gained a much greater understanding of investment analysis, but also that she was in a position to make use of Fishman's expertise in reviewing at least the significant number of actual transactions he used as his examples.

The testimony of Kermit Turley, Adams' second husband, also supports a conclusion that she was not naive and unsophisticated. Turley, a former stockbroker, testified that he on occasion discussed the Paine, Webber accounts with Adams. During these discussions they "talked about the buys and sells of various companies." Turley also testified that he and Adams spent a weekend at a YMCA camp in the fall of 1975 going over the account statements and preparing spread sheets in an effort to determine the profitability of the personal and trust accounts. Turley's testimony indicates that the preparation of the spread sheets was a joint undertaking in which both he and Adams participated. Again, Adams' participation in this analysis, when viewed in the light most favorable to the defendants, could support the conclusion that she had by this time gained a considerable level of investment sophistication.

Adams' association with Fishman and Turley, and her retention of attorney Robert Appel and James Weist, an Arthur Anderson & Company accountant, could also support the conclusion that she was in a position to make use of the investment knowledge and experience of those individ-

uals in reviewing the management of her Paine, Webber accounts.

In addition to the possibility that Adams either became relatively sophisticated or made use of the sophisticated individuals available to her, the record presents an extraordinarily high frequency of communication between Ocrant and Adams. She received frequent account statements, summaries, and computer printouts from Ocrant. Several witnesses also testified to the fact that Adams communicated with Ocrant as often as several times per day. Indeed, Turley testified that even during a vacation in Mazatlan, Mexico, Adams was in telephone contact with Ocrant to discuss her account. In addition to phone conversations and meetings with Ocrant in her home, Turley testified that Adams went down to Paine, Webber's offices to discuss her account roughly five times per month. Thus, Adams was in frequent communication with Ocrant, a consideration which could suggest that their relationship might not have been one of trust and confidence and that Ocrant did not in fact exercise control over her accounts. *See* majority op. at 517.

The possibility that Adams was not as naive as the majority suggests and the fact of frequent communication must be weighed against the substantial evidence indicating that Ocrant did in fact exercise control over the accounts. Indeed, the plaintiff here presented so much persuasive evidence that I would be willing to accept the majority's affirmance of the decision to take the question of the existence of a fiduciary relationship away from the jury were the standard for a directed verdict merely "a preponderance of the evidence" or "clear and convincing evidence." *Safeway Stores; McGlasson.* However, the decision to remove the issue of fiduciary duty from the jury would only be appropriate in the absence of evidence upon which a jury could justifiably find that a fiduciary relationship existed. *See Tri-Aspen Construction Co. v. Johnson,* 714 P.2d 484, 487 (Colo.1986). The evidence presented as to Adams' sophistication and frequent communications with Ocrant is, when viewed in the light most favorable to the defendants,

sufficient to support the conclusion that Adams, and not Ocrant, exercised control over the accounts. Since the evidence is disputed and reasonable persons could reach different conclusions from that evidence, I conclude that the trial court committed reversible error in taking this issue from the jury. I would therefore reverse and remand for a new trial.