Patrick A. RUPERT, Petitioner,

v.

**CLAYTON BROKERAGE COMPANY OF ST. LOUIS, INC., Respondent.**

No. 85SC179.

Supreme Court of
Colorado En Banc.

June 8, 1987.

Keene & Munsinger, Stephen M. Munsinger, Denver, for petitioner.

Kelly, Haglund, Garnsey & Kahn, Edwin S. Kahn, Denver, for respondent.

ERICKSON, Justice.

We granted certiorari to review *Rupert v. Clayton Brokerage Co. of St. Louis*, 705 P.2d 988 (Colo.App.1985). The court of appeals reversed a judgment in favor of Patrick A. Rupert (Rupert) and against Clayton Brokerage Co. of St. Louis, Inc. (Clayton) for breach of a fiduciary duty in opening and maintaining a discretionary commodities trading account. The court of appeals remanded to the district court with directions to reassess the damages suffered by Rupert. Two issues are before us on appeal: (1) the extent of the fiduciary duty Clayton owed to Rupert and (2) the amount of damages that resulted, if any,

from a breach of that fiduciary duty. We reverse and remand to the court of appeals with directions to reinstate the judgment entered by the district court.

## I.

The petitioner, Patrick Rupert, is a carpenter residing in Fraser, Colorado. In 1977, Rupert obtained a $20,000 settlement for injuries he suffered in an automobile collision. At the time of the settlement, Rupert did not own a home, and his annual income was less than $10,000. His personal assets, including an automobile and trade tools, were worth less than $10,000. The settlement proceeds represented a substantial portion of his net worth.

In September 1978, Rupert met with Robert Hunt, a college acquaintance, who was a stockbroker with E.F. Hutton & Co., Inc. (Hutton). Hunt told Rupert that he was involved in a stock option index program that utilized a computer forecast and that the program was a viable vehicle to make investment profits. Rupert subsequently met with Hunt and two of his colleagues, David Forward and Gary McAdam, at Hutton's Denver office to discuss the program. Forward and Hunt told Rupert that the program had been successful in the past, but advised him that the investment was risk-oriented. Rupert decided to invest in the program, and gave Hunt $19,500 of the funds he received from his personal injury settlement. He had no prior experience with financial investments other than life insurance.

Rupert maintained the account at Hutton for three months. Hunt, Forward, or McAdam made the investment decisions at Hutton without Rupert's prior approval. Rupert received monthly statements detailing the activity in his account, and written confirmations of trades shortly after they were executed. Trading was limited initially to stock options, but soon began in commodities futures contracts, which are complicated and high risk investments requiring specialized knowledge and experience to participate successfully. *See Karlen v. Ray E. Friedman & Co. Commodities*, 688 F.2d 1193, 1198 (8th Cir.1982). Once com-

modities trading began, Rupert signed a Risk Disclosure Statement outlining the substantial risks of futures trading.

By December 1978, Rupert had lost $5,226.67 in the Hutton account. At that time, Hunt approached Rupert and told him that Forward, McAdam, and he were leaving Hutton and affiliating themselves with Clayton. On Hunt's advice, Rupert terminated his account at Hutton and transferred the remaining $13,273.37 to Clayton, to be placed in a discretionary trading account similar to the one maintained at Hutton. To accomplish the transfer, Hunt directed Rupert to sign various documents, including a contact sheet, an account contract, an authorization for discretionary trading, and another risk disclosure statement. The contact sheet and the trading authorization contained information blanks concerning Rupert's income, net worth, and other financial matters, and these blanks were filled in with grossly inflated figures by an agent of Clayton after Rupert signed the forms. The trading authorization granted Forward the authority as attorney in fact to buy, sell, and trade in commodities or commodities futures contracts in the name and on behalf of Rupert without his prior approval.

Shortly after Rupert executed the account forms, he received a letter from Claude Bielmann, Clayton's Secretary and Treasurer, advising him that Forward had been granted discretionary authority to trade on his behalf. The letter explained that Rupert could terminate Forward's authority upon delivery of a written revocation, and that Rupert should keep abreast of market information. The letter also advised Rupert that futures investments carried a high risk.

Over the next four months, Rupert's account balance declined steadily under Forward's management. As with Hutton, Clayton provided Rupert with monthly statements of his account and written confirmations of trades soon after they occurred. As the trading losses mounted, Rupert instructed Hunt to close the discretionary account, and Forward's trading authorization was cancelled on February 14,

1979. The money was transferred to a "standard" account, where Rupert ostensibly controlled the trading decisions. However, Rupert continued to allow trades to be made by Hunt, in consultation with Forward.

After the revocation of Forward's trading authority, Rupert's account continued to decline until May 7, 1979, when Rupert returned from a vacation to discover that his account balance had dropped to $588.63. At that time, he called Clayton and asked to speak to Hunt, but was advised that Hunt was no longer with the company. Rupert requested that his account be closed and that the remaining balance be forwarded to him.

On February 18, 1981, Rupert brought suit against Hutton, Clayton, Hunt, Forward, and McAdam. The complaint alleged claims for breach of fiduciary duty, extreme and outrageous conduct, exemplary damages, excessive trading, and fraud. Hutton and MacAdam settled for $5,226.67 and $750, respectively, and Rupert elected to release Hunt. The claims against Clayton and Forward were tried to the court.

At trial, Rupert established that when he opened the account, Clayton had in effect a compliance manual containing rules pertaining to commodities accounts and discretionary trading authority. These rules required, *inter alia:* (1) that each discretionary account maintain a balance of $15,000; (2) that each account executive handling a discretionary account have a minimum of three-years experience in commodities trading and two-years experience with Clayton; (3) that account executives ascertain before opening a commodities account the investor's occupation, source of income, net worth, investment experience, and amount of risk capital; (4) that the office manager confirm that the investor can risk at least two times the amount of capital committed to commodities trading; (5) that all account forms signed by the investor not be altered once they have been signed; (6) that once an investor's account balance in a discretionary account drops below $7,500, the investor must be notified that he either must liquidate the account, revoke discre-

tionary trading authority, or deposit additional funds; and (7) that once an investor's account balance in a discretionary account drops below $6,500, the investor's account must be liquidated.

Based upon Clayton's violations of the foregoing rules, the trial court found that Clayton negligently handled Rupert's account, and that its negligence breached the fiduciary duty it owed to Rupert. The court stated that Clayton's violation of its own procedures did not establish liability *per se*, but held that the requirements set forth in the compliance manual were indicative of the standard of care that must be followed in dealing with other people's money. The court concluded that the totality of the evidence established that Clayton breached the standard of care, and that the breach resulted in damage to the plaintiff in the amount of $11,881, representing the full loss in Rupert's account.[1] The court dismissed the case against Forward and the remaining claims against Clayton. Clayton appealed.

The court of appeals reversed, and held that Clayton's decision to accept the discretionary account in violation of its own rules did not breach a fiduciary duty owed to Rupert because Clayton owed no duty to him before the account was opened. The court of appeals concluded, however, that Clayton was responsible for any losses occurring in the account between the time the account balance fell below $7,500 and the time discretionary trading authority was revoked, and remanded the case to the trial court for a determination of that amount. We disagree with the court of appeals analysis of the issues of liability and damages, and now reverse.

## II.

■ Where a customer relinquishes practical control over his brokerage account to a stockbroker, the broker owes wide-ranging fiduciary duties to the customer to manage the account in accordance with the customer's needs and objectives. *Paine, Webber, Jackson & Curtis, Inc. v. Adams,* 718 P.2d 508, 515 (Colo.1986); *Henricksen v. Henricksen,* 640 F.2d 880 (7th Cir.1981). A broker who becomes a fiduciary of his client must act with utmost good faith, reasonable care, and loyalty concerning the customer's account, and owes a duty to keep informed regarding changes in the market which affect his customer's interests, to act responsibility to protect those interests, to keep the customer informed as to each completed transaction, and to explain forthrightly the practical impact and potential risks of the course of dealing in which the broker is engaged. *Thropp v. Bache Halsey Stuart Shields, Inc.,* 650 F.2d 817, 819–20 (6th Cir.1981); *Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 461 F.Supp. 951, 953 (E.D.Mich.1978). The existence and breach of a fiduciary duty in the context of a stockbroker/customer relationship is a question of fact to be determined by the jury or by the court sitting as the trier of fact. *Paine, Webber,* 718 P.2d at 518 (Colo.1986).

■ Here, Clayton concedes that it owed a fiduciary duty to Rupert once Forward controlled the discretionary account.[2] Clayton asserts, however, that: (1) the court erred as a matter of law in considering Clayton's violation of its own internal rules, (2) that the trial court's judgment must be reversed because any violation of the internal rules occurred before discretionary trading authority was granted and is irrelevant to Rupert's claim, and (3) that Rupert's losses were not caused by a

---

**1.** Although the record is unclear regarding the trial court's computation of damages, the court apparently awarded Rupert the difference between his initial deposit and the sum of his various withdrawals from the account.

**2.** The trial court implicitly found that Clayton's fiduciary status continued in fact after Forward's discretionary trading authority was revoked. We cannot hold as a matter of law that

the court's finding was erroneous. The existence of a fiduciary duty must be judged on the substance of a transaction, rather than on its form, and competent evidence supported a finding that Hunt and Forward continued to control the account after discretionary authority was revoked. *See Paine, Webber, Jackson & Curtis v. Adams,* 718 P.2d 508, 516 (Colo.1986).

breach of its fiduciary duties, but rather by market forces. We disagree.

### A.

■ A broker's negligence in handling a discretionary account may give rise to a breach of the broker's fiduciary duty to use reasonable care and to use the skills and diligence necessary to protect the client's interests. *Thropp v. Bache Halsey Stuart Shields, Inc.*, 650 F.2d 817, 820 (6th Cir. 1981). The trial court in this case found that Clayton acted negligently with respect to Rupert's account, and that Clayton's negligence established a breach of Clayton's fiduciary duty. These findings, if supported by competent evidence in the record, must be upheld on appeal. *See City of Aurora v. Loveless*, 639 P.2d 1061 (Colo.1981); *Ferguson v. Gardner*, 191 Colo. 527, 554 P.2d 293 (1976).

■ Clayton does not assert that the record contains insufficient evidence to support the trial court's findings. Rather, Clayton contends that its violation of its own internal rules pertaining to customer and broker suitability and the operation of discretionary accounts was irrelevant to the court's inquiry into its liability. We do not agree. Although evidence of a broker's violation of a custom or internal rule adopted for the protection of its customers does not automatically establish liability, a court may consider the custom or rule in a case-by-case determination of whether the broker breached a fiduciary duty to the customer.[3] *See Thropp v. Bache Halsey Stuart Shields, Inc.*, 650 F.2d 817 (6th Cir.1981) (a stockbroker's violation of internal operating procedures is relevant to the court's finding of a negligent breach of a fiduciary duty); W. Keeton, *Prosser and*

*Keeton on Torts* § 33, at 196 (1984) (the defendant's deviation from rules governing the conduct of its employees is relevant to a determination of the defendant's negligence). *Cf. Henricksen v. Henricksen*, 640 F.2d 880 (7th Cir.) (a broker's violation of its internal rules may establish liability for its employee's misconduct under section 20(a) of the Securities and Exchange Act of 1934), *cert. denied*, 454 U.S. 1097, 102 S.Ct. 669, 70 L.Ed.2d 637 (1981); *Lange v. H. Hentz & Co.*, 418 F.Supp. 1376 (N.D.Tex. 1976) (a proven violation of National Association of Securities Dealers (N.A.S.D.) Rules of Fair Practice is relevant to the issue of what fiduciary duties are owed by a broker to an investor); *Piper, Jaffray & Hopwood Inc. v. Ladin*, 399 F.Supp. 292 (S.D.Iowa 1975) (violations of stock exchange and N.A.S.D. rules are admissible as evidence of the stockbroker's negligence).[4]

Indeed, the rules Clayton established to protect its customers were consistent with and no more onerous than those imposed by regulatory organizations upon their member brokers in a variety of investment contexts. For example, Article III, Section 2 of the N.A.S.D. Rules of Fair Practice provides:

> In recommending to a customer the purchase, sale, or exchange of any security, *a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of facts, if any, disclosed by such customer* as to his other security holdings and as to his financial situation and needs.

*See NASD Manual* (CCH) ¶ 2152 (1985) (emphasis added). Although the N.A.S.D. "suitability rule" does not impose a duty

---

**3.** Distinguishable are those cases in which courts have held that absent allegations of fraud, there is no private cause of action for a broker's violation of an exchange or internal operating rule. *Hill v. Bache Halsey Stuart & Shields, Inc.*, 790 F.2d 817, 820 n. 4 (10th Cir. 1986); *Merrill Lynch, Pierce, Fenner & Smith v. Goldman*, 593 F.2d 129, 133–34 (8th Cir.1979). We are not concerned here with implied rights of action based solely on the defendant's violation of its compliance manual, but rather with the proper standard of care that Clayton must

meet in dealing with other people's money. We are not persuaded that the court must blind itself to standards adopted by the defendant for the protection of its clients.

**4.** *See also Mercury Investment Co. v. A.G. Edwards & Sons*, 295 F.Supp. 1160 (S.D.Tex.1969); *Marshall v. Isthmian Lines, Inc.*, 334 F.2d 131 (5th Cir.1964); Morris, *The Role of Administrative Safety Measures in Negligence Actions*, 28 Tex.L.Rev. 143 (1949).

upon a broker to investigate the customer's investment objectives, the N.A.S.D. Board of Governors has issued a policy statement requiring brokers to obtain information concerning a customer's other securities holdings before recommending speculative, low-priced securities. *NASD Manual* (CCH) ¶ 2152 (1985). *See also* Cohen, *The Suitability Rule and Economic Theory,* 80 Yale L.J. 1604, 1605 n. 7 (1971).

Comparable to N.A.S.D.'s suitability rule, the New York Stock Exchange has adopted Rule 405, which imposes broad duties upon member organizations to inquire into essential facts about every customer, order, or account. Commonly known as the "know-your-customer rule," Rule 405 provides:

> Every member organization is required through a general partner, [or] a principal executive officer ... to ·
>
> (1) Use due diligence to learn the essential facts relative to every customer, every order, every cash or margin account accepted or carried by such organization and every person holding power of attorney over any account accepted or carried by such organization.
>
> (2) Supervise diligently all accounts handled by registered representatives of the organization.

*See* 2 *New York Stock Exchange Guide* (CCH) ¶ 2405 (1984). *See also Piper, Jaffray & Hopwood Inc. v. Ladin,* 399 F.Supp. 292, 295 (S.D.Iowa 1975).

Finally, the Commodities Futures Trading Commission promulgated a proposed investor suitability rule in September 1977, which provided:

> (a) No Commission registrant or representative thereof may, directly or indirectly, make any recommendation to any customer concerning the purchase, sale or continued holding of any commodity interest, or may effect, directly or indirectly, any transaction in a commodity interest for a customer pursuant to discretionary power or authority ... unless the Commission registrant or representative thereof—

> (1) Within a reasonable period of time before the recommendation or transaction,
>
> (i) Obtained from the customer the *essential facts about the customer's financial condition and trading objectives,* and
>
> (ii) Verified with the customer the accuracy of that information if previously obtained, and
>
> (2) At the time of the recommendation or transaction, *had reason to believe that the recommendation or transaction was suitable for the customer in light of*
>
> (i) *The information obtained from the customer and otherwise known about the customer by the Commission registrant or representative thereof,* and
>
> (ii) *The risk of loss involved therein.*

*See* Standards of Conduct for Commodity Trading Professionals, 42 Fed.Reg. 44,742, 44,750 (1977) (emphasis added). The proposed rule was not adopted, however, because the Commission determined that the suitability concept was implicit in the existing anti-fraud rules, and that efforts to further codify the concept would risk narrowing its scope. *Jensen v. Shearson Hayden Stone, Inc.,* [1980–1982 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 21,062 (CFTC July 28, 1980); Customer Protection Rules, 43 Fed.Reg. 31,886, 31,889 (1978). *See also Phacelli v. Conticommodity Services, Inc.,* [1984–1986 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 22,345 (CFTC Sept. 12, 1984) (futures commission merchant violated suitability concept implicit in section 4 of the Commodity Exchange Act by placing unsuitable customer at risk in the futures market and imperiling his livelihood).

In sum, the rules by which a brokerage firm protects its customers and controls its employees and accounts, while not determinative, cannot be wholly ignored as irrelevant to the standards of care the firm must meet to discharge its fiduciary duties. The rules are evidence of the defendant's knowledge of the risks involved, knowledge of the precautions that are necessary to

reduce the risks, and the feasibility of such safeguards. W. Keeton, *Prosser and Keeton on Torts* § 33, at 193 (1984); Winters, *The Evidentiary Value of Defendant's Safety Rules in a Negligence Action*, 38 Neb.L.Rev. 906, 909–12 (1959). The court in this case properly recognized that Clayton's violation of its own rules did not establish liability *per se*, but that the compliance manual was relevant to Clayton's negligent handling of an investor's funds. The trial court committed no error in that regard.

### B.

■ We also reject Clayton's assertion that the violation of its rules pertaining to the opening of commodities accounts was irrelevant because they preceded the time at which Clayton first incurred a fiduciary duty to Rupert. Clayton's internal standards regarding broker's experience and minimum account balances were ongoing requirements. Consequently, its violation of those rules continued long after the account was opened and Clayton became a fiduciary of Rupert. Moreover, Clayton's violation of its rules pertaining to the opening of commodities trading accounts did not occur prior to the opening of Rupert's account, but rather contemporaneously with it. When Clayton accepted a discretionary commodities account in violation of its own rules, Clayton at once incurred, and breached, its fiduciary duty to Rupert. The trial court, in finding a negligent breach of a fiduciary duty, properly considered Clayton's violation of its own rules concerning the opening of the account.

### C.

On the question of causation, the trial court found that the entire loss in Rupert's commodities account resulted from Clayton's negligence.[5] That finding, if supported by competent evidence, will not be disturbed on appeal. *Samuelson v. Chutich*, 187 Colo. 155, 529 P.2d 631 (1974); *Fowler Real Estate Co. v. Ranke*, 181 Colo. 115, 507 P.2d 854 (1973). Clayton concedes that if it had complied with its investor and broker suitability standards and account minimums, Rupert's account never would have been opened, the brokers never would have traded the account, and the losses would not have occurred. However, Clayton contends that Rupert must prove not only that its negligence allowed the transaction to occur, but also that his trading losses were caused directly by its conduct, and not by market forces. We disagree.

■ To establish causation, the plaintiff must prove that the defendant's conduct was a substantial contributing cause of the injury. *Thropp v. Bache Halsey Stuart Shields, Inc.*, 650 F.2d 817, 821 (6th Cir.1981); W. Keeton, *Prosser and Keeton on Torts* § 41, at 265 (1984). If the defendant's conduct is a substantial contributing cause of the injury, it is irrelevant to the causation analysis whether other factors, including market forces beyond the defendant's control, also contributed to the injury. *See Thropp*, 650 F.2d at 821. Where an investor's transactions would not have occurred but for the broker's failure to police the propriety of the transaction, causation may be established. *Id.*

■ In the instant case, Clayton's operation of the discretionary account in violation of its own investor and broker suitability rules and rules pertaining to the maintenance of such accounts permitted its brokers to enter into transactions that ultimately dissipated Rupert's funds. A stockbroker who becomes a fiduciary of his customer must possess the skills necessary to manage the customer's account with rea-

---

5. In awarding Rupert damages in an amount equal to the full decline in his trading account, the trial court properly compensated him for his out-of-pocket loss. Compensation based on the plaintiff's "out-of-pocket" loss has been utilized frequently by courts and regulatory agencies in securities and commodities fraud cases because it is a satisfactory device for awarding rough compensation when relief is warranted. *See* *Karlen v. Ray E. Friedman & Co. Commodities*, 688 F.2d 1193, 1202 (8th Cir.1982); *Twomey v. Mitchem, Jones & Templeton, Inc.*, 262 Cal. App.2d 690, 69 Cal.Rptr. 222 (1968); Frankhauser & Selig, *Private Actions Under the Commodity Exchange Act: Implying Less and Enjoying it More*, 35 Bus.Law. 847, 859 (1980); Note, *Churning by Securities Dealers*, 80 Harv.L.Rev. 869, 883–85 (1967).

sonable care, and must appreciate and advise his customer of the risk entailed in the chosen course of investment. The rules contained in Clayton's compliance manual were tailored to reduce or forestall the losses occurring when unqualified investors or inexperienced brokers embark on a course of trading which requires specialized knowledge, business acumen, and substantial financial resources, and to protect the customer's account against depletion and deficiency liability. We cannot say as a matter of law that even if Clayton had maintained Rupert's account in a diligent manner and discharged its fiduciary obligations to him, the losses in his account still would have occurred. The trier of fact in this case reasonably could conclude that Clayton's negligence set the stage for Rupert's trading losses, and was a substantial contributing cause of the injury suffered.[6] Therefore, the trial court's conclusion that there was a sufficient causal connection between Rupert's loss and Clayton's negligence is supported by the evidence, and must be affirmed.

Accordingly, the judgment of the court of appeals is reversed, and the case is remanded with directions to reinstate the judgment entered by the district court in favor of Rupert.

DUBOFSKY, J., does not participate.

---

**6.** We emphasize that Clayton's liability for Rupert's trading losses does not follow automatically from a finding that Clayton breached one or more of its internal rules. A broker's violation of rules established for the protection of its customers is only evidence admissible to establish the broker's negligence. In addition, even if negligence is established, the plaintiff still must prove under established principles of tort law that the negligent conduct was the legal cause of the injury.