FILED
**United States Court of Appeals
Tenth Circuit**

**July 25, 2024**

**Christopher M. Wolpert
Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

DIANNA CHRISTINE MURPHY,

    Plaintiff - Appellee,

v.

THOMAS SCHAIBLE,

    Defendant - Appellant,

and

SCHAIBLE, RUSSO & COMPANY,
C.P.A.'S, L.L.P.,

    Defendant.

No. 22-1421

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:19-CV-02808-WJM-MEH)**

_____

Kendra N. Beckwith (Hilary D. Wells, with her on the briefs), Lewis Roca Rothgerber
Christie LLP, Denver, Colorado, for Defendant-Appellant.

Anthony T. Golz (Cory M. Curtis, with him on the brief), Cokinos Young, P.C., Houston,
Texas, for Plaintiff-Appellee.

_____

Before **HARTZ**, **McHUGH**, and **FEDERICO**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

Defendant Thomas Schaible appeals the district-court order denying his motion for judgment as a matter of law that sought to set aside a jury verdict finding him liable for breaching his fiduciary duty to Plaintiff Dianna Murphy, who was the wife of his brother Michael during the relevant events.[1] Thomas was the investment advisor to Dianna and Michael with respect to an account the two held as joint tenants with rights of survivorship. The alleged breach concerned Thomas's following Michael's instructions to transfer virtually all the cash in the account to a Colorado bank account in anticipation of Michael's then transferring the funds to a Mexican bank account controlled solely by Michael. This action by Thomas allegedly breached his fiduciary duty to Dianna because he failed to inform her of the proposed transfer when she could have prevented it or to advise her of steps she could have taken to protect herself, despite his knowledge of the couple's marital difficulties and Dianna's interest in dividing the couple's assets.

Thomas contends (1) that Dianna did not suffer a legally compensable injury from the transfer of funds by Michael, her joint tenant, who had full legal authority to transfer the funds and (2) that he did not breach any fiduciary duty to her by following Michael's instructions without informing or advising her. We reject both contentions. We also reject Thomas's argument that Dianna was not entitled to

---

[1] Because the three principal actors shared the same last name at the time of the relevant events, we hereafter avoid confusion by referring to them by their first names.

prejudgment interest because of alleged procedural deficiencies in district court. We have jurisdiction under 28 U.S.C. § 1291 and affirm the judgment below.

## I.    BACKGROUND

### A.    Factual Background

Thomas, a licensed investment advisor, was the financial advisor and accountant for Michael and Dianna. In particular, he was the couple's "investment advisor representative" for their investment account with Securities Service Network, Inc. (the SSN account). When they opened the SSN account in 2007, the couple signed a "Client Advisory Services Agreement" (the Agreement or Client Agreement). Aplt. App., Vol. VII at 1991. It did not authorize Thomas to make investment choices for the couple, and stated that they "shall at all times maintain full and complete ownership rights (i.e., the right to add or withdraw securities or cash . . . ) to all assets held in their account." *Id.* at 1997. The Agreement further stated that the investment-advisor representative "may act upon instructions from any account holder." *Id.* at 1998. In 2014 the couple signed an "SSN Account Form," *id.* at 1940, which stated that their ownership of the SSN account was as joint tenants with rights of survivorship. Later, they executed standing payment instructions authorizing transfers via bank wires from the SSN account to an account at First Bank of Vail held jointly by the couple.

Dianna and Michael began having marital difficulties in late 2016. On December 29, 2016, Dianna emailed one of Michael's other brothers (not Thomas) to tell him of a car crash seriously injuring the adult son of Michael and Dianna. The email also informed him that Michael "wanted a divorce" and had said he would "destroy" Dianna and their

3

children. *Id.* at 2010. She said Michael "got crazy insane," that she had called the police, and that "his lack of rational thinking is making me worried." *Id.* This email was forwarded to Thomas, who then forwarded it to his wife, saying, "Not good." *Id.* at 2009.

On February 24, 2017, Dianna sent a long email to Thomas discussing her marital troubles with Michael and what she perceived as his "serious" mental-health issues, and asking about a "facility" Michael could be sent to. *Id.* at 2014. In particular, she told Thomas:

> [I]t is important that you know that Mike is at the extreme level of instability his motives actions and every other moment of each and every day are unpredictable and without any reality and filled with lies. I worry about our future as I believe he will do everything he can to destroy it. *So please do not allow him to make any irrational financial decisions*[.] That is I believe the only thing that you can really do to help Mike, me and the kids.

*Id.* (emphasis added). Thomas's response suggested the couple take some time apart to evaluate their next steps and said, "I wish I had a simple solution to this quagmire but coming to Mexico to confront my brother will be disastrous and I believe alienate him even further if he indeed needs the help you speak of he needs to come to that realization himself." *Id.* at 2013.

On March 11 Michael emailed Thomas to ask about the fees being charged on the SSN account and whether they applied to cash holdings. He stated that if they did, "we might be better holding the cash ourselves." *Id.* at 2016. At trial Dianna admitted that she had read Michael's emails and that by March 13 she was aware of his inquiry about fees but never mentioned it to Thomas.

On March 15 Dianna emailed Thomas a list of the couple's joint assets, stating that she had "sent mike this list. It was my beginning point on separating our assets. He would prefer that I just go away and everything stays the same. Wish it were that simple. . . . I am wondering thought [sic] the process for separating our interest in terms of voya mutual funds and cash?" *Id.* at 2020. She went on to discuss ways the couple might divide various other assets. Thomas did not respond to this email, though he forwarded it to Michael on March 31 at Michael's request.

On March 22 Dianna emailed Thomas again, knowing that he was on a ski vacation with his family. She had what she called a "silly question" for him:

> I have figured out so far that is much more beneficial for mike and I to distribute our US assets mutually before any kind of filing. . . . my silly question to you is can I not just request that you distribute our mutual fund accounts cash and . . . cash out the voya and send 50% towards each? I was just wondering if I am empowered to request such? Do I have any access to request small amounts of dinero? never had to before so don't really know the rules. . . . I have always deeply appreciated your guidance and investment advice.

*Id.* at 2019. Thomas did not respond to this email either, though he also forwarded it to Michael on March 31.

On March 30 Dianna emailed Michael to tell him she was driving from Mexico, where the couple lived, to a home they had in Colorado. She testified that at this point she "had had enough." *Id.*, Vol. IV at 989–90. Michael forwarded this email to Thomas the same day. He also separately emailed Thomas:

> I really need all the mails from Dianna to you guys. . . . She is not well and I do not agree that she can simply, unilaterally decide to walk away and dictate terms. My goal will be to pay all bills as I always do until she decides to end this marriage. I guess that is what she is hell bent on. She

5

doesn't want to live here in Mexico, doesn't want to live with me . . . Shouldn't be driving alone to San Diego either. Irrational and irresponsible decisions all the way around.

*Id.*, Vol. VII at 2034.

Later that day, Michael emailed Thomas again. He stated, "We do not want to pay any fees on cash at this time so we prefer to move the cash please. Can you hold on to our investments but transfer the 2.6 [million] cash to our Vail account so as I may transfer it back home here to Mexico." *Id.* at 1947. Thomas called Michael to confirm the transfer and to inform him that the account did not have $2.6 million available, and Michael approved the transfer of $2.5 million instead. That night, Michael sent Thomas another email to ask about the tax consequences of liquidating all the investments held in the joint SSN account. The total value of the assets in the account, including the $2.5 million in cash, was almost $7 million.

The next day, March 31, Thomas confirmed to Michael that he had initiated the transfer of the $2.5 million. He also responded to Michael's email regarding liquidation of the SSN-account assets, explaining the tax consequences of liquidation and making recommendations about how to liquidate the Voya investment. And, as Michael requested, Thomas forwarded him Dianna's March emails. The cash transfer to the couple's Vail bank account was not completed until three days later, on April 3. Within a day or two Michael transferred the $2.5 million from the Vail account to an account in Mexico that Dianna could not access.

Before the $2.5 million transfer there had never been a transfer from the SSN account larger than $100,000. Thomas never contacted Dianna regarding the transfer

6

of cash out of the SSN account. Dianna testified that if she had known about Michael's plans to transfer the cash in the SSN account she "would have refused to [sic] the transfer of cash to Mexico." *Id.*, Vol. IV at 1125–26.

On April 7 Dianna sent Thomas several emails, including one in which she asked "what money movements and or transactions have been made since we last spoke and the current status of our accounts." *Id.*, Vol. VII at 2036. In that email she also wrote that "[a]s you know it is my intention to have 50% of our cash, funds, and voya and any other US stuff recognized individually," explained that she had met with a new financial planner and accountant, and requested financial information for tax purposes. *Id.* Although Thomas did respond to Dianna's other emails, which discussed tax filing and business entities that she shared with Michael, he did not respond to her email asking about money movements, the status of the SSN account, and the possible division of the couple's assets; nor did he tell her about the $2.5 million transfer that had been completed on April 3. He did, however, forward Dianna's email to Michael, saying, "Here we go. . ." *Id.*

On April 10 Dianna changed the instructions on the SSN account to not allow any activity in it without the express written permission of both parties. While Michael made several further requests for funds from the SSN account, no transfers were made while Thomas was the couple's broker because of the freeze Dianna put on the account.

On April 11, 2017, Dianna emailed Thomas to try to establish a division of the couple's assets. In that email she explained that "I became aware inadvertently of the

cash transfer to the Vail account and subsequent transfer, (the next day I think) to Mike's personal account in Mexico. So I understand that the balance of the SSN is approximately half of our mutual assets in the US." *Id.* at 2053. She forwarded the email to Michael, adding, "I will assume that you will continue to pay all of our expenses as you indicated you would to me. As you are in possession of all of our cash, it is logical to me this is your intention." *Id.* at 2052. Michael emailed Thomas that day, explaining that "[t]here will be no division of anything between Dianna and I. . . . I would ignore her. Any division of cash or assets will be the result of divorce settlement in Mexico and it certainly will not include an even division of these funds." *Id.* at 2051. Thomas responded, "Thought as much." *Id.* Thomas did not respond to Dianna's email.

Dianna filed for divorce in June 2017. Thomas resigned as investment advisor for the SSN account in December 2017.

## B.    Procedural History

Dianna filed suit against Thomas in October 2019, alleging that Thomas breached his fiduciary duty to her by facilitating the transfer of funds out of the SSN account without her knowledge or consent and failing to inform her of it before or after the transfer was made.[2]

The case proceeded to jury trial. At the close of Dianna's case-in-chief, Thomas moved for judgment as a matter of law under Fed. R. Civ. P. 50(a). The

---

[2] Dianna also sued Thomas's company, Schaible, Russo & Company, C.P.A.'s, L.L.P. (SRC). The jury found for SRC and she does not appeal that verdict.

district court granted the motion in part but denied the motion with respect to the claim addressed in this appeal.

In June 2022 the jury found for Dianna, awarding her $600,000 in economic damages, which were based entirely on the withdrawal by Michael of the funds in the SSN account.

Two weeks after the verdict, Dianna filed a "Motion for Prejudgment Interest and Entry of Judgment," and in December Thomas filed a motion for judgment as a matter of law under Fed. R. Civ. P. 50(b). In June 2023 the district court awarded Dianna $415,083.26 in prejudgment interest, denied Thomas's Rule 50(b) motion, and entered a separate "final judgment."

On appeal Thomas challenges the denial of his Rule 50(b) motion and the award of prejudgment interest. We affirm the district-court judgment.

## II.    ANALYSIS

### A.    Standard of Review

"We review a district court's denial of a Rule 50 motion de novo, applying the same standards [that govern] the district court." *Bill Barrett Corp. v. YMC Royalty Co.*, 918 F.3d 760, 766 (10th Cir. 2019) (internal quotation marks omitted). "A party is entitled to judgment as a matter of law only if the court concludes that all of the evidence in the record reveals no legally sufficient evidentiary basis for a claim under the controlling law." *Id.* (brackets and internal quotation marks omitted). "The court draws all reasonable inferences in favor of the nonmoving party and does not weigh evidence, judge witness credibility, or challenge the factual conclusions of the jury."

*Id.* (internal quotation marks omitted). We review de novo the proper interpretation of the Rules of Civil Procedure. *See In re Unioil, Inc.*, 962 F.2d 988, 990 (10th Cir. 1992). Because the parties agree that Colorado substantive law applies, we will proceed under that assumption. *See Butler v. Daimler Trucks N. Am., LLC*, 74 F.4th 1131, 1140–41 (10th Cir. 2023) (applying Kansas law where parties agreed it applied).

### B.     Breach of Fiduciary Duty

It is undisputed that Thomas was acting as a fiduciary to Dianna when Michael's transfer occurred. Thomas raises only two challenges to the denial of his Rule 50(b) motion to set aside the jury's verdict on Dianna's claim that he breached his fiduciary duty to her. First, he argues that because Dianna and Michael were joint tenants who each had an ownership interest in the entirety of the SSN account, Dianna incurred no legally cognizable damages when Michael exercised his right to possession of the cash in the account. Second, Thomas argues that because Michael and Dianna were joint tenants on the account and he was permitted by the Client Agreement to act under instructions from either account holder, he had no fiduciary duty to notify Dianna about the transfer, refuse to perform it, or take any other action for Dianna's protection. We are not persuaded.

#### 1.     *Joint Tenancy and Damages*

Although Thomas contends that he did not breach any fiduciary duties owed to Dianna, his first argument on appeal is that even if he did, she suffered no legally cognizable damages. He points out that any loss she incurred resulted from the

transfer of funds from the SSN account but that the transfer was on the order of Michael, who, as a joint tenant, had full legal authority to make such an order. How, Thomas argues, could Dianna suffer a legal injury from a fully legal act of Michael's? We proceed to explain, starting with a brief primer on joint tenancy with rights of survivorship, the capacity in which Dianna and Michael owned their SSN account.

"[J]oint tenancy is a form of ownership in which each joint tenant possesses the entire estate, rather than a fractional share." *Taylor v. Canterbury*, 92 P.3d 961, 964 (Colo. 2004) (citing *United States v. Craft*, 535 U.S. 274, 280 (2002) ("The common law characterized each joint tenant as possessing the entire estate, rather than a fractional share: Joint-tenants have one and the same interest held by one and the same undivided possession." (cleaned up))). But though "each co-owner is entitled to possess and enjoy the entire estate" while the joint tenancy is intact—a feature that "enables the survivor of the joint tenants to obtain sole possession of the whole property without any further conveyance"—each "joint tenant has an undivided fractional share of the tenancy. If the joint tenancy is ever terminated by severance, the joint tenant will receive only the portion of the property that corresponds to that fractional share." 7 Powell on Real Property § 51.03[2].

Proceeding on the assumption that each tenant had a right to withdraw all the money in the account, Thomas claims that "[a]s a matter of law, a trier of fact cannot award damages to a joint tenant based on the amount of money withdrawn from an account by another joint tenant." Aplt. Br. at 27. And because at trial the only

evidence of economic damages permitted by the court was the reduction in value of the jointly held SSN account resulting from Michael's withdrawal, Thomas argues that he is entitled to judgment as a matter of law on Dianna's claim. *See Miller v. Byrne*, 916 P.2d 566, 575 (Colo. App. 1995) ("To prove a claim for breach of fiduciary duty a plaintiff must demonstrate . . . that he or she has incurred damages and that the defendant's breach of fiduciary duty was a cause of the damages sustained.").

This argument might well be a winner if Dianna were suing her cotenant Michael for withdrawing the money from the SSN account. But Dianna is not suing her cotenant. She has not argued that Michael lacked lawful authority to move the funds. Her claim is that Thomas had a fiduciary duty to protect her from Michael's "lawful" actions. Thomas does not dispute that Dianna was *financially* injured by Michael's transfer of the funds, which left her with less money. And that is all that is necessary to show that Thomas caused damages to her.

There is nothing novel about holding a defendant (like Thomas) liable for injury to a plaintiff (like Dianna) caused by a lawful interaction of the plaintiff with a third party (like Michael). For example, a third-party business A may have every right not to enter into a contract with the plaintiff. But if the defendant improperly induced third-party A not to do business with the plaintiff, the defendant may be liable to the plaintiff. *See, e.g.*, *Omedelena v. Denver Options, Inc.*, 60 P.3d 717, 719–721 (Colo. App. 2002) (defendants liable for tortious interference with prospective economic advantage that plaintiff sought with a third party). Or, to give

12

an example where the defendant is a fiduciary of the plaintiff, an attorney who negligently misrepresents the tax consequences of a client's lawful purchase of an investment from a third party may be liable for the loss sustained when no tax advantages materialize. *See* Restatement (Third) of Torts: Liability for Economic Harm § 5 Negligent Misrepresentation Ill. 5 (2020). Thus, even if Michael lawfully transferred the funds from his joint account with Dianna, that would not in itself relieve Thomas of liability for failure to protect Dianna from economic loss suffered because of the transfer.

We reject Thomas's argument that Dianna could not have suffered any legally cognizable economic damages as a result of Michael's transfer.

### 2.    *Breach of Fiduciary Duty*

Thomas does not dispute that he stood as a fiduciary to Dianna with regard to the SSN account and had the typical duties of a fiduciary. Those duties under Colorado law have been outlined by the State's highest court:

> A fiduciary is a person having a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with the undertaking. A fiduciary has a duty to deal with utmost good faith and solely for the benefit of the beneficiary. A fiduciary's obligations to the beneficiary include, among other things, a duty of loyalty, a duty to exercise reasonable care and skill, and a duty to deal impartially with beneficiaries.

*Destefano v. Grabrian*, 763 P.2d 275, 284 (Colo. 1988) (affirming fiduciary liability of priest to husband and wife for whom he provided marriage counseling) (citations and internal quotation marks omitted) (citing Restatement (Second) of Trusts §§ 170, 174, 183 (1959)); *see Paine, Webber, Jackson & Curtis, Inc. v. Adams*, 718 P.2d 508,

13

515 (Colo. 1986) (agent who is a fiduciary regarding a customer's account has "wide-ranging duties in managing the customer's account in accordance with the customer's needs and objectives"); *cf.* Colo. Rev. Stat. Ann. § 15-1-304 (mandating that fiduciaries managing and investing property for others "shall exercise the judgment and care, under the circumstances then prevailing, which men of prudence, discretion, and intelligence exercise in the management of the property of another"). "A broker who becomes a fiduciary of his client must act with utmost good faith, reasonable care, and loyalty concerning the customer's account, and owes a duty . . . to act responsib[ly] to protect [the customer's] interests, to keep the customer informed as to each completed transaction, and to explain forthrightly the practical impact and potential risks of the course of dealing in which the broker is engaged." *Rupert v. Clayton Brokerage Co. of St. Louis*, 737 P.2d 1106, 1109 (Colo. 1987). "The law imposes a strict duty of disclosure upon a fiduciary," which includes the requirement that the fiduciary "make a full and complete disclosure of all facts relative to the subject of his agency which it may be material to the principal to know." *Wheeler v. Carl Rabe, Inc.*, 599 P.2d 902, 904 (Colo. 1979) (internal quotation marks omitted); *see also Olsen v. Vail Assocs. Real Est., Inc.*, 935 P.2d 975, 978 (Colo. 1997) (same); *Adams*, 718 P.2d at 514 n.6 (affirming jury verdict where jury was instructed that a fiduciary stockbroker "must make full and complete disclosure of all facts which may be material for his customer to know"); Restatement (Third) of Trusts § 82(1)(c) & cmt. d (2007) (a fiduciary trustee must "inform . . . beneficiaries of important developments and information that

14

appear reasonably necessary for the beneficiaries to be aware of in order to protect their interests").

The nature and scope of the duty owed by a fiduciary are determined by the court as a matter of law from the factual context of the relationship found by the factfinder or stipulated by the parties, while the factfinder determines whether there has been a breach of any fiduciary duty defined by the court. *See Command Commc'ns, Inc. v. Fritz Cos.*, 36 P.3d 182, 186 (Colo. App. 2001); *see also Raleigh v. Performance Plumbing & Heating*, 130 P.3d 1011, 1015 (Colo. 2006) (in negligence case, "[w]hether a specific defendant owes a duty to a specific plaintiff under the circumstances involved with a tort claim is a question of law we review de novo").

Thomas does not dispute that he owed Dianna all the aforementioned fiduciary duties in regard to the SSN account. Instead he claims that, as a matter of law—given Michael and Dianna's equal rights as joint tenants to withdraw all the SSN-account funds and the Client Agreement authorizing Thomas to act on the authority of either of them—he had no specific duty in this circumstance to refuse Michael's transfer request, to inform Dianna about the transaction, or otherwise to advise her regarding her options on how to retain control of the funds in the SSN account. We cannot agree.

We think Thomas's fiduciary duties in this respect are well-defined by Colorado law. But he claims support for his position from a non-Colorado opinion, *Zimmerman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 391 N.W.2d 353, 356 (Mich.

15

App. 1986). The court in that case, rejecting a claim that a broker had breached his fiduciary duties, declared that "[b]rokers generally are not required to individually apprise co-owners of a joint account as to the independent transactions of other owners. Nor are brokers required to disregard orders from one owner of a joint account where there is a perceived conflict of interest with another owner." The case involved a mother and her son who were co-owners of a joint brokerage account. *See id.* at 354–55. Eventually, over the course of four years, the son withdrew all $250,000 from the account, and the mother sued the brokerage firm, alleging breach of fiduciary duty. *See id.* at 355. During the entire period the mother was informed of each transaction by a mailed confirmation and through a monthly statement, yet she never objected to them. *See id.* at 356. The court said that "[a]ny duty imposed upon defendant to inform plaintiff was fulfilled by those mailings." *Id.*

We need not decide the extent to which we think Colorado courts would agree with *Zimmerman* because this case is readily distinguishable. *Zimmerman*, unlike our case, did not involve a fiduciary who failed to inform his client of a major transaction (one 25 times greater than any other single transaction up to that point); the contested withdrawals took place over the course of four years, not, as here, on a single occasion; each withdrawal was reported to the plaintiff in a confirmation mailing and a monthly statement; and while the plaintiff in *Zimmerman* argued that "it became apparent that [her son] was depleting the account contrary to the plaintiff's purpose and interest," *id.*, the fiduciary broker was not made aware, as Thomas was, of significant interpersonal issues between the two joint tenants, nor was he ever instructed, as Thomas was, not to allow

16

the other joint tenant to "make any irrational financial decisions," Aplt. App., Vol. VII at 2014, or that the complaining joint tenant would like to split the account's assets in contemplation of a divorce.

Moreover, if we are to look to out-of-state cases, we think the language in a case relied on by Dianna is closer in point and more persuasive in the context before us. In *Leuzinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 396 S.W.2d 570, 576 (Mo. 1965), the court held:

> Pursuant to the general duty of a stockbroker to act in good faith with customers and to make a complete and full disclosure of all material facts concerning a transaction, if the stockbroker knows of facts and circumstances which would lead an ordinarily careful and diligent person to believe that one joint tenant of a joint brokerage account was in the process of wrongfully converting to his own uses and purposes the interest of the other joint tenant, a duty to inform the latter would arise, and in such case the broker would be derelict in disbursing the whole account to the joint tenant under suspicion, without first informing the other and obtaining consent and approval to the disbursement.

The brokerage firm was not liable, however, because there was "nothing in the admitted facts to indicate . . . anything which under the circumstances would have aroused the suspicions of an ordinarily careful and diligent stockbroker." *Id.* at 577. A later case, *Roth v. Roth*, 571 S.W.2d 659, 670 (Mo. App. 1978), relied on this language from *Leuzinger* to hold a fiduciary broker liable for a breach of his fiduciary duty to the plaintiff, a joint-tenant on a brokerage account, where the broker allowed the transfer of all the assets in the account to the other joint tenant while "[k]nowing of facts which should have led an ordinarily careful and diligent broker to believe a conversion might be taking place" and without informing the plaintiff or

obtaining his consent to the transfer. *See also Wood v. Jack Carl Assocs., Inc.*, 782 F.2d 83, 87 (7th Cir. 1986) (discussing the *Leuzinger* theory of fiduciary duty in the case of a joint brokerage account). We think it clear that under the *Leuzinger* approach a jury could permissibly find Thomas liable for breaching his fiduciary duty to Dianna insofar as he failed to halt or delay Michael's withdrawal of the cash, to inform her of the transfer, or to inform her of her rights in regard to the account despite "know[ing] of facts and circumstances which would lead an ordinarily careful and diligent person to believe that one joint tenant" was about to take steps contrary to the wishes of the other joint tenant and deleterious to the other joint tenant's interests. *Leuzinger*, 396 S.W.2d at 576.

In any event, we do not rely on out-of-state authority. Colorado fiduciary-duty law is sufficient for us to answer in the affirmative the question whether Thomas may be held liable, as a matter of law, for his acts and omissions relating to the withdrawal of the SSN account's cash. Though in his appellate briefs Thomas insists that he had no duty to disobey Michael's transfer instruction, we think the jury could permissibly find Thomas liable for a breach of fiduciary duty.

Most prominently, the jury could find that Thomas breached the "strict duty" imposed on a fiduciary to "make a full and complete disclosure of all facts relative to the subject of his agency which it may be material to the principal to know." *Wheeler*, 599 P.2d at 904 (internal quotation marks omitted). In this context, information is material when it would assume "actual significance" in the deliberations of the fiduciary's client, or when it would have "significantly altered

the total mix of information available" to the client in regard to the object of the fiduciary duty. *Olsen*, 935 P.2d at 979. Despite being aware of the couple's marital difficulties and the fact that Dianna was driving from Mexico to Colorado around the time Michael requested the transfer; despite Dianna's questions about separating the couple's assets, which suggested that a divorce was contemplated and that any large money movements would be information she would like to know; despite Michael's request for all the cash in the SSN account, a transfer 25 times larger than any previous transaction; and despite Dianna's request that he not "allow [Michael] to make any irrational financial decisions," Aplt. App., Vol. VII at 2014, Thomas did not inform Dianna of the transfer or of her ability to freeze the account or change the account's payment instructions. Indeed, even when Dianna explicitly asked, a few days after the transfer had been completed, "what money movements and or transactions have been made since we last spoke and the current status of our accounts," *id.* at 2036, Thomas failed to inform her of it, when there was apparently still time for her to block the transfer to Mexico from the Vail bank. And Dianna testified that had she known about it, she "would have refused to [sic] the transfer of cash to Mexico," *id.*, Vol. IV at 1125–26; and she froze the account once she learned of the transfer. In these circumstances, the jury could find that it was material for Dianna to know that all the cash in the joint account was being withdrawn, and that Thomas's failure to inform her of that fact constituted a breach of his fiduciary duty. *See* Restatement (Third) of Agency § 8.11 (2006) ("An agent has a duty to use reasonable effort to provide the principal with facts that the agent knows, has reason

to know, or should know when . . . the agent knows or has reason to know that the principal would wish to have the facts or the facts are material to the agent's duties to the principal."); *cf.* Restatement (Third) of Trusts § 82(1)(c) & cmt. d (2007) (trustee fiduciaries must "inform fairly representative beneficiaries of important developments and information that appear reasonably necessary for the beneficiaries to be aware of in order to protect their interests").

The jury could also find that Thomas breached his duty to "deal impartially with beneficiaries." *Destefano*, 763 P.2d at 284. Dianna sent Thomas multiple emails asking for advice on how to divide the assets in the SSN account, emails to which he never responded. He also never responded to her request asking about the status of the account and if any money movements had occurred. But Thomas responded promptly to Michael's questions about the tax consequences of liquidating the SSN-account assets, his request that Thomas forward him Dianna's emails, and of course his request to initiate the transfer of all the cash in the account. This difference in treatment was sufficient to allow the jury to find that Thomas breached his fiduciary duty of impartiality. *See McNeil v. McNeil*, 798 A.2d 503, 509–10 (Del. 2002) (fiduciary trustees violated the duty of impartiality by failing to furnish to one beneficiary important information that they furnished to other beneficiaries). When the fiduciary knows his beneficiaries have conflicting desires, he cannot simply pick his favorite, particularly when the choice is based on personal concerns, such as filial affection. *See Taylor v. Taylor*, 381 P.3d 428, 431 n.1 (Colo. App. 2016) ("A fiduciary is required to act with good faith and loyalty unaffected by personal motives.").

There may be sufficient evidence to establish other breaches by Thomas of his fiduciary duties, but these two will suffice.

Thomas nevertheless insists that under "Colorado law, the parties' contractual agreement supersedes common law duties," Aplt. Reply Br. at 12, and therefore, as a matter of law, he did not breach any fiduciary duties in obeying Michael's transfer order because the Client Agreement gave him the authority to act under instructions from either joint tenant. *See Rocky Mountain Expl., Inc. v. Davis Graham & Stubbs LLP*, 420 P.3d 223, 235 (Colo. 2018) ("Even when a fiduciary relationship exists . . . the parties to that relationship may modify—or even disclaim—that relationship" by contract). We disagree.

We remind Thomas that fiduciary duties are not dependent on the contract. *See, e.g.*, *Bailey v. Allstate Ins. Co.*, 844 P.2d 1336, 1339 (Colo. App. 1992) ("[T]he existence of a contract between a fiduciary and beneficiary is secondary to the nature of a true fiduciary relationship."); *cf. Hess Oil Virgin Islands Corp. v. UOP, Inc.*, 861 F.2d 1197, 1202 (10th Cir. 1988) ( "A party may be liable in tort for breaching an independent duty towards another, even where the relationship creating such a duty originates in the parties' contract."). To be sure, in some circumstances a contractual provision could have limited Thomas's fiduciary duties. But we need not determine the extent to which Colorado law allows fiduciary duties to be limited by contract, because the parties' contract did not conflict with Thomas's fiduciary duties. The agreement says only that the investment advisor "*may* act upon instructions from any account holder," Aplt. App., Vol. VII at 1998 (emphasis added); it contains no

21

command that the advisor *must* obey either account holder's instructions no matter the circumstances. Neither does it include an express disclaimer of Thomas's fiduciary duties. *See Rocky Mountain Expl., Inc.*, 420 P.3d at 235 (a party had no fiduciary obligation where the parties' contract clearly and unambiguously disclaimed any fiduciary relationship). Thus, to the extent that Thomas's fiduciary duties demanded that he delay or refuse to process the transfer, the Client Agreement posed no obstacle.

Further, even if Thomas is correct that he had to honor Michael's transfer request, the Client Agreement did not preclude him from performing the other fiduciary duties that he owed Dianna. In particular, nothing in the agreement prevented him from informing Dianna about the transfer, or from informing her of her right to change the payment instructions on the SSN account to require written authorization by both account holders, a right she in fact exercised shortly after learning about the transfer.

Thus, we affirm the denial of Thomas's Rule 50(b) motion. In doing so we emphasize the narrowness of our ruling. This, we hope, is an extreme case. We are not saying that a fiduciary to joint-tenant account holders needs to affirmatively investigate whether there exists a conflict between his clients before he follows their individual instructions, particularly when there is legitimate need for speed in executing a transaction. We hold only that in circumstances similar to this case— where the jury could properly find that Thomas was well-informed of the conflict between his clients; that Thomas treated his clients disparately, apparently for the

22

improper personal motive of filial affection; and that the circumstances of Michael's transfer put Thomas on notice that it was likely harmful to Dianna—he had fiduciary duties to inform her of the requested transfer in time for her to protect her interests and to respond to related requests for information. His failure to do so in those particular circumstances justified the jury's finding that he breached his fiduciary duties to Dianna.

### C.     Prejudgment Interest

Thomas also argues that the district court's award of prejudgment interest was procedurally flawed and should be reversed. The jury verdict was noted in the district court docket on June 7, 2022, but there was no entry of a judgment, *see* 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2785 (3d ed. 2024) (Wright & Miller) ("Mere notation of a verdict is not entry of judgment."), and no separate "final judgment" document was issued. Dianna filed her motion for prejudgment interest on June 20. On June 28, 2023, more than a year later, the district court granted the motion and entered a separate "final judgment" document.

Thomas contends that the district court's grant of the motion was too late. He reasons as follows: Because the district court did not file a separate document setting out the June 7, 2022 jury verdict as a "final judgment," final judgment was entered on November 4, 2022, 150 days after the verdict, by operation of Fed. R. Civ. P. 58(c)(2). And because the court failed to address Dianna's motion for prejudgment interest before the 150-day deadline, it was "denied . . . by operation of law" when

23

final judgment was entered on November 4, 2022. Aplt. Br. at 54. He contends that if Dianna wanted to seek prejudgment interest, she was required to do so by filing a Rule 59(e) motion within 28 days after final judgment was entered on November 4, 2022, and that, because she did not, the district court had no authority to grant the motion in June 2023.

We reject the argument. It misconstrues the rules regarding finality of judgments. Those rules are intricate. To properly resolve the issue before us, we must review them in some detail.

To begin with, courts traditionally have said that a judgment is not "final" under 28 U.S.C. § 1291, which provides federal appellate jurisdiction over final decisions, until the district court has disposed of all claims against all parties, leaving nothing for the district court to do beyond ministerial tasks. *See Catlin v. United States*, 324 U.S. 229, 233 (1945) ("A 'final decision' generally is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment."); *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) ("[T]o be final, a decision must reflect the termination of all matters as to all parties and causes of action." (internal quotation marks omitted)); *Est. of Cummings, by and through Montoya v. Cmty. Health Sys., Inc.*, 881 F.3d 793, 805 (10th Cir. 2018) (judgment was final when it left district court with nothing more than "ministerial tasks" to perform).

The time at which final judgment is entered is consequential. Most importantly, it starts the clock running on the time for appeal. But it also controls the

time for filing postjudgment motions. The date of entry of judgment should therefore not be ambiguous. Unfortunately, however, this seemingly simple issue has presented problems. At one time the problem was in determining whether a document actually constituted a judgment. For example, an opinion issued by the district court might include language stating that a motion for summary judgment was granted but omit other matters generally considered elements of a judgment. Hence, the Rules of Civil Procedure were revised in 1963 to require that the judgment ordinarily be "set out in a separate document." Fed. R. Civ. P. 58(a);[3] *see id.* advisory committee's note to 1963 amendment; *see also Bankers Tr. Co. v. Mallis*, 435 U.S. 381, 385 (1978) (Rule 58(a) "made clear that a party need not file a notice of appeal until a separate judgment has been filed and entered," but parties can waive this separate-document requirement). The entry of such a separate document did not, however, eliminate the requirement of finality. Even when such a document was entered a circuit court could, indeed was required to, reject an appeal because there was no final judgment, as when, for example, the district court's order had not unambiguously disposed of a claim or counterclaim by a party. *See, e.g.*, *Alman v. Taunton Sportswear Mfg. Corp.*, 857 F.2d 840, 842–43, 844 (1st Cir. 1988) (although district court entered a separate document setting forth its decision, the judgment was not yet final and appealable

---

[3] A separate document is not required for "an order disposing of a motion: (1) for judgment under Rule 50(b); (2) to amend or make additional findings under Rule 52(b); (3) for attorney's fees under Rule 54; (4) for a new trial, or to alter or amend the judgment, under Rule 59; or (5) for relief under Rule 60." Fed. R. Civ. P. 58(a)(1)–(5).

because it failed to unambiguously dispose of all claims at issue); *St. Mary's Health Ctr. of Jefferson City v. Bowen*, 821 F.2d 493, 496–97 (8th Cir. 1987) (although district court complied with the separate document requirement, the order set out in that document was not final because it failed to dispose of several claims); 11 Wright & Miller § 2785 ("It should be borne in mind that Rule 58 states how a judgment is entered. It does not speak to whether a judgment entered in this fashion is a 'final judgment' for purposes of appeal."). What the separate-document requirement did do was reduce confusion concerning the timing of the final judgment.

Still, timing problems remained. The "simple separate document requirement [was] ignored in many cases," with the result that the times to appeal and to file postjudgment motions ran indefinitely. Fed. R. Civ. P. 58(a) advisory committee's note to 2002 amendment. The Rule was therefore amended again in 2002 to provide that if the court fails to set out an otherwise final judgment in a separate document, the judgment becomes final by operation of law 150 days after its entry in the civil docket. *See id.* 58(c)(2) (where a separate document is required, "judgment is entered . . . when the judgment is entered in the civil docket under Rule 79(a) and the earlier of these events occurs: (A) it is set out in a separate document; or (B) 150 days have run from the entry in the civil docket"). Again, however, this Rule cannot cure lack of finality of the judgment. Its purpose is merely to clarify timing.

It may be helpful in this context to distinguish between what we can call *substantive* and *technical* finality. A judgment is *substantively* final when the court has disposed of all matters as to all parties and causes of action, leaving it nothing

but ministerial tasks to complete. *See Dodge*, 328 F.3d at 1221; *Est. of Cummings*, 881 F.3d at 805. That substantively final judgment ordinarily becomes *technically final*—starting the time running to file an appeal or submit postjudgment motions— only when it is entered in a separate document or after 150 days have elapsed since it was entered in the civil docket. *See* Fed. R. Civ. P. 58(c)(2); *Alman*, 857 F.2d at 842 ("[E]ven a decision that completely disposes of a case's merits can lack finality for the purposes of section 1291 if it fails to comport with the *technical* dictates of Rules 58 and 79(a) of the Federal Rules of Civil Procedure." (emphasis added)).

Thomas's error is in failing to distinguish between substantive and technical finality. Yes, the judgment against him may have been on its face technically final upon the expiration of 150 days after the verdict was entered, but there could be no final judgment until there was a substantively final judgment. We therefore examine when there was a substantively final judgment against him.

The jury verdict disposed of all issues then before the court. Ordinarily, that would quickly become a final judgment. *See* Fed. R. Civ. P. 58(b)(1) ("[U]nless the court orders otherwise, the clerk must, without awaiting the court's direction, promptly prepare, sign, and enter the judgment when: (A) the jury returns a general verdict."). In this case, the clerk did not enter judgment on the verdict. But even if judgment had been entered, its finality could be suspended upon the timely filing of a postjudgment motion. *See Hogan v. Pilgrim's Pride Corp.*, 73 F.4th 1150, 1159 n.8 (10th Cir. 2023) (filing of a timely Rule 59(e) motion "suspends the finality of the judgment" (internal quotation marks omitted)). Relevant here, a "postjudgment

27

motion for discretionary prejudgment interest constitutes a motion to alter or amend the judgment under Rule 59(e)." *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 175 (1989). And a postjudgment motion to alter or amend a judgment is timely if filed "no later than" 28 days after entry of judgment, Fed. R. Civ. P. 59(e), even if filed before the judgment becomes technically final, *see Hilst v. Bowen*, 874 F.2d 725, 726 (10th Cir. 1989) ("Although Rule 59 motions are to be served not later than ten[4] days after entry of judgment, courts and commentators generally agree that this ten-day limit sets only a maximum period and does not preclude a party from making a Rule 59 motion before a formal judgment has been entered."); Fed. R. Civ. P. 59(e) advisory committee's note to 1995 amendment ("The phrase 'no later than' is used—rather than 'within'—to include post-judgment motions that sometimes are filed before actual entry of the judgment by the clerk."). Dianna's filing of her motion for prejudgment interest (within 28 days of the jury verdict) was thus timely, and that timely postjudgment motion suspended the substantive finality of the judgment[5] until it was resolved by the district court. *See Dodge*, 328 F.3d at 1221 (judgment was not final until pending prejudgment-interest motion was resolved, as "[p]rejudgment

---

[4] When *Hilst* was decided, Rule 59 required that 59(e) motions be served no later than 10 days after entry of judgment. In 2009 the period to file a Rule 59(e) motion was expanded from 10 days to 28 days. *See* Fed. R. Civ. P. 59(e) advisory committee's note to 2009 amendment.

[5] Before the filing of the motion for prejudgment interest, all issues before the court had been resolved by the verdict, so there was substantive finality. But perhaps the district court was anticipating a motion for prejudgment interest and therefore instructed the clerk not to enter judgment on the verdict (which would have been necessary for technical finality).

interest is a portion of the damages and thus is an integral part of the merits decision" that must be resolved before final judgment). Thomas's theory that the motion was rejected by operation of law by virtue of the 150-day rule is therefore unsound.

We see no procedural defect in the district court's award of prejudgment interest.

### III.    CONCLUSION

The judgment of the district court is **AFFIRMED**.